2020 IL App (1st) 200546

FIFTH DIVISION
December 24, 2020

No. 1-20-0546

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| CITY OF COUNTRY CLUB HILLS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Counterdefendant-Appellant, | ) | |
| | ) | |
| v. | ) | No. 18 CH 13458 |
| | ) | |
| | ) | |
| DERRICK CHARLES, | ) | |
| | ) | Honorable Michael T. Mullen, |
| Defendant-Counterplaintiff-Appellee. | ) | Judge Presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court, with opinion.
Justice Rochford concurred in the judgment and opinion.
Justice Cunningham dissented, with opinion.

**OPINION**

¶ 1     The City of Country Club Hills charged police officer Derrick Charles with lying in

connection with the City's investigation of a 2017 detainee escape, and with malingering

overnight in a deserted parking lot when he was supposed to be helping maintain order after the

nightly last call at a notoriously rowdy local night club. An arbitrator heard evidence regarding

the charges. The arbitrator found there was a valid basis for discipline only as to the detainee

escape charge, and determined that the penalty as to that charge would be a written warning. The

City then filed a complaint in circuit court against Charles and his union to vacate the arbitration award. The complaint asked the court to overturn the arbitrator and terminate Charles's employment, on the basis that the light penalty of a written warning was against public policy. Charles and the union filed a counterclaim seeking confirmation and enforcement of the arbitrator's award. The circuit court granted summary judgment in favor of Charles and the union, and against the City. We reverse.

¶ 2                                    BACKGROUND

¶ 3     Most, but not all, of the relevant facts are uncontested, and we recite them as they were determined by the arbitrator. The first incident occurred on June 24, 2017 when Charles arrested Bernard Barfield for criminal trespass relating to a stolen vehicle. Charles placed Barfield into a holding room at the police station. He later removed Barfield from the holding room and took him into a booking room. The booking room was fitted with a steel door and a combination lock on the outside which unlocks with a numerical code. Police department rules require that the booking room door must be closed when a suspect is inside to prevent escape. A "no firearms beyond" sign is posted on the door. Outside the room, there is a metal gun locker built into the wall in which officers may secure their weapons. The no-firearms rule applies to police officers, but Charles brought his firearm into the room.

¶ 4     Barfield escaped from the booking room through an open door, ran down the lobby hallway, and unlocked a door leading to the lobby. There was a struggle inside the police station vestibule but Barfield was able to escape from the building. Eventually, Charles tased Barfield and he was apprehended. Barfield was charged with aggravated battery for spitting on an officer during the fracas. A police sergeant was also injured and required medical treatment.

¶ 5 At the direction of the police chief, a supervisor sent an email to Charles requiring him to provide a statement: "Regarding the Bernard Barfield incident *** please reply with a **detailed** account of events; explanation of the circumstances leading up to prisoner Barfield managing to exit the building, the force and type used to secure him back in custody, and what your intentions are to prevent a repeated incident." (Emphasis in original). Charles responded in an email, stating in pertinent part:

"I took the offender from room #2 to the lock up area to make a phone call. *** As I was escorting the offender back to room #2 he pushed me and ran toward the lobby exit door. I grabbed the offender several times before he reached the lobby door but was unable to get a hold of him. The offender then opened the lobby exit door and ran into the lobby. I continued to struggle with the offender and he made it to the vestibule, the offender continued resisting while in the vestibule and was then able to maneuver his way outside of the building. Once outside of the building I was able to grab the offender near the bike racks, I held the offender ordering him to get on the ground, and stop resisting. The offender refused and continued to resists. [The email continues with a description of how other officers arrived and assisted in subduing the offender.] *** I believe that the offender's familiarity with the layout of the CCH police station and prior knowledge that the lobby exit door is not locked were factors in his attempt to escape. Although it is not common practice, I intend to handcuff all prisoners in my custody even while escorting them to various locations inside the police station. Nothing further."

¶ 6 Charles's email omits that he had forgotten to lock the door and that he had carried a weapon into a secure area where weapons were prohibited. The police chief determined that Charles's response was not a "detailed" account and that it omitted those critical facts. Charles

eventually admitted that he omitted these facts from his response and conceded that his failure to lock the door was, at least, a contributing factor to the escape.

¶ 7    The booking room and other areas of the police station were under video surveillance, and the videotape of the incident was shown to the arbitrator, which corroborated the testimony of witnesses regarding the chain of events. While no copy of the video is in the record transmitted to this court, the record does contain two "placeholder" pages suggesting that a video was submitted to the circuit court.

¶ 8    The second incident occurred on August 25, 2017. Room 183, a night club in the City (the Club), sponsored a "Ladies' Night" every Thursday which was known to produce an unruly crowd at closing time, around 2:00 a.m. Based on the Club's past history, police supervisory staff reallocated personnel from other duties and authorized overtime to ensure maximum coverage outside the Club on Thursday nights. Charles volunteered for an overtime shift running from 10:30 p.m. on Thursday, August 24 to 7:00 a.m. the following morning. Various witnesses testified to the arbitrator that: (1) it was well known in the police department that officers would staff the Club's Thursday closings; and (2) at the roll call for the shift, the commanding officer announced, "Fellows, we've got the Club tonight." Charles admitted he was aware of the club's notoriety, but variously either denied hearing the admonition "we've got the Club tonight" or claimed that he misunderstood it as not specifically requiring *him* to report to the Club that evening.

¶ 9    Charles did not, in fact, report to the Club at the closing hour. An investigation, which included review of the GPS tracker on his squad car, revealed he was not dispatched to any other calls that night, but instead remained stationary in the parking lot of an abandoned nursing home a mile away from the Club during the Club's closing hours. The ignition in his squad car was

turned off from 1:14 a.m. to 2:08 a.m. which rendered him unable to hear certain radio dispatches. During an investigatory interrogation conducted pursuant to the Uniform Peace Officers' Disciplinary Act (50 ILCS 725/1 *et seq.* (West 2018)), Charles denied that he was directed to be at the Club that night. He also denied hearing any radio traffic regarding any need for Room 183 police presence, which could have been because the radio channel would not be heard if the squad car was off. Charles claimed he was "doing traffic enforcement, reading reports, or typing a report" during the time in question. However, no such reports were produced by him or the City during the investigation. Testimony was presented that the isolated location was not suitable to monitor passing traffic and that an officer running traffic enforcement must keep his squad car's ignition on to better pursue a passing motorist. Charles eventually admitted he was aware of the need for extra crowd control at the Club on Ladies' Nights. He gave the following testimony before the arbitrator:

"Q. So you knew you had a bar where there was tough stuff happening, right, right?

A. Yes.

Q. Potentially, right?

A. Correct.

Q. You knew the shift commander said it is club night guys, correct?

A. Yes.

Q. And isn't it true then that you made a conscious decision not to go by that bar during the hour period where there is tough stuff going on?

A. No, sir.

Q. Well, did you attempt to go there?

A. As I stated, I went to the club several times during my shift.

Q. The question is you made a conscious decision, didn't you, sir, not to go to that bar during the hour that you knew was the priority time between 1:00 and closing time?

A. I wouldn't say that I made a conscious decision. I was doing something else pertaining to police work at that time.

Q. What were you doing?

A. I don't recall. I was in the City of Country Club Hills. I was in my squad car.

* * *

Q. You don't know what you were doing for that hour, do you?

A. I don't recall exactly, no.

Q. You don't know if you were doing traffic enforcement?

A. No.

Q. And are you disputing the GPS?

A. No."

¶ 10 The police chief filed charges against Charles, alleging that he violated numerous department rules and regulations. In summary, and as relevant here, the charges alleged that Charles: (1) submitted an incomplete, and therefore untruthful, report regarding the escape incident, specifically regarding the unlocked door and the transportation of a weapon into a secure area; (2) failed to follow an order of a superior officer by failing to report to the Club; and (3) was untruthful by claiming that he was typing and preparing official reports while he was in

the nursing home parking lot. The chief sought to terminate Charles's employment as a City police officer.

¶ 11 The collective bargaining agreement between the City and Charles's union allowed officers to have disciplinary matters submitted to binding arbitration. Charles opted for arbitration. The collective bargaining agreement provides that the City may discipline an officer for "just cause," but the agreement does not define that term. At all pertinent times, the City had rules in place requiring police officers: (1) to "be constantly alert *** keeping a vigilant watch for needed police services"; (2) to keep prisoners securely; (3) to obey lawful orders of superior officers; and (4) authorizing discipline up to and including discharge for acts "which endanger[] the safety, health or well-being of any City employee, the public, vendors or agents" or for violation of department rules.

¶ 12 Charles was terminated from the police force pending the arbitration. At the arbitration, the parties stipulated to the arbitrator's jurisdiction and that the issues for him to decide were whether the City had just cause to discharge Charles, and, if not, what the penalty should be.

¶ 13 After hearing the evidence set forth above, the arbitrator issued an opinion and award. As to the prisoner escape incident, the arbitrator found that Charles failed to follow proper procedures during arrest and booking; failed to lock the booking room door, which was a contributing factor in Barfield's escape; and improperly omitted his failure to lock the door in his post-incident report. While he found some of Charles's statements "could be viewed as somewhat self-serving and self-exonerating," he determined there was insufficient evidence to find they were made with the intent to deceive "through omission of material fact."

¶ 14 Regarding the Club incident, the arbitrator found that the City failed to prove the existence of an order requiring Charles to report to Room 183, but that Charles nonetheless

lacked candor in his report of his activities that night. Despite these findings, the arbitrator determined to impose no discipline regarding the Club incident. He allowed the City to issue a written warning for his failure to secure his weapon and lock the booking room door, and directed the City to reinstate Charles.

¶ 15   The City filed a single-count complaint in the circuit court to vacate the arbitration award, arguing that the award was against public policy to the extent that it did not impose the penalty of discharge. The complaint also requested that the court "uphold the termination of Charles" from the police department. The union and Charles filed an answer and a counterclaim seeking confirmation of the award. The parties filed cross-motions for summary judgment on the complaint and counterclaim and fully briefed the relevant issues. During the pendency of the litigation, the City's police officers certified a new union which was briefly substituted as a party in place of its predecessor. However, the successor union was eventually dismissed by agreement, leaving Charles as the only defendant. The City filed an amended complaint which was identical to the original except for the change in the status of the union as a party. The pending motions for summary judgment proceeded under the amended complaint.

¶ 16   On February 24, 2020, the circuit court entered an order confirming the arbitration award, granting Charles's motion for summary judgment, and denying the City's motion for summary judgment, "for the reasons stated on the record." No report of those proceedings is in the record before us. This appeal followed.

¶ 17                          ANALYSIS

¶ 18   On appeal, the City argues that the circuit court erred by granting summary judgment in favor of Charles, by denying its motion for summary judgment, resulting in a final order upholding the arbitrator's award. The City contends that, under the facts presented, any award

imposing a penalty of less than discharge violates public policy. Recognizing the deference which we must afford to the arbitrator's findings of fact, the City also presses that certain facts relating to Charles's conduct are uncontested. Charles, for his part, urges this court to affirm the circuit court, contending that the arbitrator was in the best position to view and consider the credibility of the witnesses and that public policy does not specifically require that Charles be discharged for his conduct.

¶ 19    The Uniform Arbitration Act (Arbitration Act) (710 ILCS 5/1 to 23 (West 2018)) "provides for very limited judicial review of an arbitrator's award." *Hawrelak v. Marine Bank, Springfield*, 316 Ill. App. 3d 175, 178 (2000). An arbitrator's award may be vacated only (1) if the award was procured by fraud, corruption, or other undue means, (2) when partiality or misconduct by the arbitrator is evident, (3) when the arbitrator exceeded his or her powers, or (4) when the arbitrator improperly refused to postpone a hearing or hear material evidence to a party's prejudice. *Id.* at 179. On judicial review, there is a presumption the arbitrator did not exceed his or her authority and we must construe the award, when possible, to uphold its validity. *Id.* This is because the parties have contracted how their disputes are to be resolved, "and judicial modification of an arbitrator's decision deprives the parties of that choice." *Id.* However, there is an exception to this general rule. A court should not enforce a collective bargaining agreement when to do so would be "repugnant to established norms of public policy." *American Federation of State, County & Municipal Employees, AFL–CIO v. Department of Central Management Services*, 173 Ill. 2d 299, 306 (1996).

¶ 20    On appeal, the City contends that the circuit court erred in granting summary judgment to the union and Charles, and in denying summary judgment to the City. Since the parties filed cross-motions for summary judgment, they conceded that no material questions of fact existed

and that only a question of law was involved that the court could decide based on the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. We review the circuit court's decision as to cross-motions for summary judgment *de novo. Id.* ¶ 30; see also *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992) (circuit court's entry of summary judgment is reviewed *de novo*).

¶ 21    Just a few months ago, our supreme court summarized the law regarding vacating an arbitral award in the public employment context on the basis it violated public policy, stating:

"It is well established that judicial review of an arbitrator's award is extremely limited and the award must be construed, if possible, as valid. This court, however, has recognized a public-policy exception to vacate arbitration awards that are based on collective bargaining agreements. Under the public-policy exception, if an arbitration award is derived from the essence of the collective-bargaining agreement, this court will vacate the award if it 'is repugnant to established norms of public policy.' Such vacatur is rooted in the common-law doctrine that a court may refuse to enforce contracts that violate law or public policy. The public-policy exception is a narrow one—one that is to be invoked only when a party clearly shows enforcement of the contract, as interpreted by the arbitrator, contravenes some explicit public policy.

In order to vacate an award under the exception, this court applies a two-step analysis. The initial question is whether a well-defined and dominant public policy can be identified through a review of our constitution, statutes, and relevant judicial opinions. If we establish the existence of a well-defined and dominant public policy, we must then determine whether the arbitrator's award, as reflected

in his interpretation of the agreement, violated the public policy. Because our inquiry is whether the arbitrator's construction of the [collective bargaining agreement], as reflected in his award, is unenforceable due to a predominating public policy, which is a question of law, our review is *de novo*." (Internal citations omitted.) *City of Chicago v. Fraternal Order of Police*, 2020 IL 124831, ¶¶ 25-26.

¶ 22    We begin as the supreme court has instructed, by assuming that the award which punished Charles with only a written warning is valid. From that starting point, we next consider whether there is a "well-defined and dominant public policy [which] can be identified through a review of our constitution, statutes, and relevant judicial opinions." *Id.* ¶ 26; see also *Dep't of Cent. Mgmt. Services v. Am. Fed'n of State, County & Mun. Employees (AFSCME), AFL-CIO*, 197 Ill. App. 3d 503, 512 (1990). "Questions of public policy are left to the courts, not the arbitrator." *Chicago Fire Fighters Union Local No. 2 v. City of Chicago*, 323 Ill. App. 3d 168, 175 (2001).

¶ 23    There is a robust and uniform body of case law establishing a public policy in Illinois that police officers be absolutely honest. In *Village of Oak Lawn v. Human Rights Comm'n*, 133 Ill. App. 3d 221, 224 (1985), the court rejected a discrimination claim brought by a police applicant who lied on her application, stating: "Trustworthiness, reliability, good judgment, and integrity are all material qualifications for any job, particularly one as a police officer. Her lying from the beginning disqualified her from consideration for the position and made her an unfit employee for the Oak Lawn Police Department." Likewise, in *Sindermann v. Civil Serv. Comm'n of Village of Gurnee*, 275 Ill. App. 3d 917, 928 (1995), the court explained: that "[A]s the guardians of our laws, police officers are expected to act with integrity, honesty, and trustworthiness." The

*Sindermann* court then quoted, with approval, a federal court which stated: " '[A] law enforcement officer is in a peculiar and unusual position of public trust and responsibility, and by virtue thereof, the public body has an important interest in expecting the officer to give frank and honest replies to questions relevant to his fitness to hold public office. *** The high obligation owed by a policeman to his employer and his peculiar position in our society certainly must be taken into account in considering the nature and effect of disciplinary proceedings instituted by the employer.' " *Id.* (quoting *Grabinger v. Conlisk*, 320 F.Supp. 1213, 1219-1220 (N.D. Ill.1970)).

¶ 24    This court has further explained that "[a] police officer's credibility is inevitably an issue in the prosecution of crimes and in the *** police department's defense of civil lawsuits. A public finding that an officer had lied on previous occasions is detrimental to the officer's credibility as a witness and as such may be a serious liability to the department." *Rodriguez v. Weis*, 408 Ill. App. 3d 663, 671 (2011) (upholding termination of a police officer who altered written reports to favor her own interests); a*ccord, Thanasouras v. Police Bd., City of Chicago*, 33 Ill. App. 3d 1012, 1014 (1975) (affirming termination of police officer who submitted a false report to his commanding officer).

¶ 25    We therefore find there is a recognized public policy in Illinois that a police officer must be honest and not provide false, misleading, or incomplete statements in connection with his duties.

¶ 26    Our analysis of the second prong of the test requires us to review the evidence presented to the arbitrator. With respect to that evidence, we note that on appeal, the appellant has the burden to provide a complete record for review in the appellate court to support a claim of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984). If no such record is provided, "it will be

presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis." *Id.* at 392; see also *In re Marriage of Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 15 (all doubts and deficiencies arising from an insufficient record will be construed against the appellant). The City has not provided this court with the video recording of the prisoner escapee incident which the arbitrator viewed. Despite this omission, the record does contain testimony of persons who were present during the prisoner escapee incident or were familiar with the police station rooms in question. We will therefore limit our consideration to that evidence rather than that contained in the missing video recording.

¶ 27    Charles contends that altering the penalty imposed by the arbitrator improperly infringes on the arbitrator's authority and his role as the finder of fact. The parties present widely divergent viewpoints on the second part of this issue. Our role is not to reweigh the evidence presented to the arbitrator. See, *e.g.*, *American Federation of State, County & Municipal Employees, AFL-CIO v. State*, 124 Ill. 2d 246, 255 (1988) (quoting *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 37 (1987) (" '[b]ecause the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept' ")).

¶ 28    The City, for its part, expresses disagreement with the factual findings but recognizes it is not this court's role to reweigh the credibility of the witnesses. Even so, the City relies not only on the arbitrator's own findings of instances of Charles's dishonesty, but on additional instances of dishonesty which the City contends are demonstrated by undisputed evidence. These include that the video (which we will not consider) and the GPS tracking on Charles's squad car.

¶ 29    We agree with the City that the GPS evidence is undisputed and that it directly rebuts the truth of Charles's investigatory statements that he was running a traffic patrol. If Charles was performing some sort of duty in the parking lot, his absence from the Club might be explainable. But he eventually admitted that he did not type any reports during the crucial closing hour during which the Club's patrons were leaving the premises, and that he did not stop any motorists or write tickets during that time, even with his engine off. Despite being provided a lengthy hearing and months to prepare, Charles was unable to produce a single report he wrote or typed while in the nursing home parking lot. This demonstrates that his statements that he was preparing reports in the parking lot were not true. Some of Charles's conduct with respect to the Barfield escape constituted lying by omission, rather than by commission. But it takes elusive logic to explain how an officer asked to truthfully and "in detail" explain how a suspect escaped from custody would not mention that the suspect escaped because the reporting officer forgot to lock the door. We agree with the City that the record, and the arbitrator's ruling, establish that Charles was dishonest by: (1) stating he was monitoring traffic and typing reports in the parking lot of the nursing home; (2) claiming a lack of knowledge that he was to report to the Club at closing hour; and (3) omitting the facts that he brought his gun into a secure area and failed to lock the door, which allowed a detainee to escape from custody.

¶ 30    The arbitrator noted conflicting evidence regarding whether Charles was ordered to report to the Club on August 24-25, both based on Charles's denial that he heard any verbal order at the roll call to that effect, and Charles's interpretation of such an order as not applying to him. We must, and do, defer to the arbitrator's resolution of the facts surrounding whether the commanding officer at the roll call gave a verbal order to Charles to report to the Club, and we do not disturb that specific factual finding. Even so, we note that the record is replete with

undisputed evidence that Charles knew or should have known that he was to report to the Club: after all, he volunteered to take an extra shift whose purpose was specifically to ensure sufficient manpower on Ladies' Night at the Club.

¶ 31    With that factual backdrop, we proceed to apply the second prong of the test, and consider whether the arbitrator's award, as reflected in his interpretation of the agreement, violated that public policy. This presents the question of whether providing only a written warning to Charles is sufficient to fulfill the public policy interest regarding honesty of police officers.

¶ 32    While we recognize that not every violation of a department rule should warrant discharge, there is substantial authority supporting the proposition that dishonesty of a police officer regarding his official duties is inimical to the sound operation of a department. As noted above, courts have recognized keeping dishonest police officers on the force creates liability issues for the department (*Rodriguez v. Weis*, 408 Ill. App. 3d 663, 671 (2011)). This makes sense, since police officers must testify in criminal trials and cross-examination regarding known incidents of past dishonesty would undermine their credibility to a court or jury and jeopardize otherwise sound prosecutions of criminal offenders.

¶ 33    Imposing only a written warning allows Charles to remain on the force, creating the possibility that his credibility as a witness will be undermined for the remainder of his career, and would encourage other officers to be dishonest when doing so would benefit them, knowing that, if caught, they would receive only a light penalty. Indeed, the overwhelming weight of authority suggests that not only is discharge an appropriate remedy for police dishonesty, it is virtually the only appropriate penalty. Even a single violation of a department rule has been found to be sufficient to warrant discharge. *Reich v. Bd. of Fire & Police Com'rs*, 13 Ill. App. 3d

1031, 1033 (1973). Cause for discharge exists when a police officer lies to his employer. *Slayton v. Board of Fire & Police Commissioners*, 102 Ill. App. 3d 335 (1981); *Kupkowski v. Board of Fire & Police Commissioners*, 71 Ill. App. 3d 316 (1979). "It is a violation of public policy to require the continued employment of an officer who has been found to be abusive and untruthful. *** It would be repugnant to public policy to retain [the] police officer in these circumstances." *Decatur Police Benevolent & Protective Ass'n Labor Comm. v. City of Decatur*, 2012 IL App (4th) 110764, ¶ 44.

¶ 34    Our supreme court has explained that "cause" in the context of discharge of a public employee is " 'some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for his no longer holding the position.' " *Dep't of Mental Health & Developmental Disabilities v. Civil Serv. Comm'n*, 85 Ill. 2d 547, 551 (1981) (quoting *Kreiser v. Police Board*, 40 Ill. App. 3d 436, 441 (1976)). As explained by our supreme court in an opinion written by Justice Freeman, "[W]hen public policy is at issue, it is the court's responsibility to protect the public interest at stake. That is why courts will not give the drunken pilot the opportunity to fly a commercial airliner again even though no harm befell his passengers." *American Federation of State, County & Municipal Employees, AFL-CIO v. Dep't of Central Management Services*, 173 Ill. 2d 299, 333 (1996).

¶ 35    Even so, we do not find, from our review of the case law, there is an absolute rule that any instance of police dishonesty must result in termination from service. Obviously, each case presents unique facts which must take into account the officer's prior record, the benefits of progressive discipline, the culpability of the officer, and the potential peril to the municipality created by the particular dishonesty at issue. A remand to the arbitrator may be appropriate to

allow the arbitrator to "correct a mistake which is apparent on the face of the award, complete an arbitration that is not complete, and clarify an ambiguity in the award." *Federal Signal Corp. v. SLC Technologies, Inc.*, 318 Ill. App. 3d 1101, 1111 (2001); *Chicago Teachers Union v. Illinois Educational Labor Relations Board*, 344 Ill. App 3d 624, 632 (2003) ("Courts have \*\*\* historically exercised the power to remand a matter to an arbitrator in limited circumstances, such as where the award is obviously incomplete or ambiguous."); see also *Clanton v. Ray*, 2011 IL App (1st) 101894, ¶¶ 30-38 (holding circuit court did not err in remanding award to arbitrator for clarification because the award was ambiguous as to whether the arbitrator had imposed joint and several liability).

¶ 36    In light of these authorities, no circumstances exist here which would suggest that we should remand this case to the arbitrator for imposition of a more severe penalty than a written warning. Dishonesty by a police officer is detrimental to the service because, among other things, it undermines the officer's credibility when testifying in criminal cases and creates liability for the municipality in civil cases. Based on the authorities cited herein and taking into consideration the cumulative mosaic of facts regarding the two incidents, we find that the only remedy consistent with public policy for Charles's misconduct is termination. Accordingly, the circuit court erred in confirming the arbitrator's award and the award itself must be vacated and replaced by a discharge order

¶ 37                                      CONCLUSION

¶ 38    We reverse the circuit court's orders granting summary judgment to Charles and the union, and denying summary judgment to the City. Pursuant to our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), we remand the case to the arbitrator with instructions to enter an award discharging Charles.

¶ 39    Reversed and remanded with instructions.

¶ 40    JUSTICE CUNNINGHAM, dissenting:

¶ 41    I respectfully dissent from the ruling of the majority in this case.

¶ 42    Unlike the majority, I conclude that the arbitrator's decision did not run afoul of public policy simply because he levied a sanction which was less than termination. It was a sanction, which in the arbitrator's judgment, was appropriate for the offense. To find otherwise would be to conclude that termination is the *only* sanction that is allowable or possible under the facts of this case.  In my view, there is no support in the record or the law for such a conclusion. Therefore, reversing the arbitrator and the circuit court of Cook County, as the majority has done, amounts to imposing the sanction that *they* think is appropriate for the conduct of officer Charles.  I suggest that this is not our role.

¶ 43    It has long been the law in Illinois and across the country, that when parties agree to arbitration to resolve conflicts, the arbitrator's decision is given great weight unless it can be shown that there was fraud, bias, or misconduct by the arbitrator. See, *e.g.*, *Craig v. United Automobile Ins. Co.*, 377 Ill. App. 3d 1, 4 (2007).  No such showing has been made in this case.

¶ 44    The majority's decision to reverse the arbitrator's ruling and impose their own sanction against officer Charles seems to be based on their belief that the sanction levied by the arbitrator was too light for the conduct which the arbitrator found officer Charles to have committed. But there is nothing about the sanction levied by the arbitrator that clearly falls outside his authority or the collective bargaining agreement between the city of Country Club Hills and the union which represents officer Charles. Thus, I find the overturning of the arbitrator's decision, based on this record, to be unfounded.

¶ 45     The two reasons which were put before the arbitrator by the city of Country Club Hills as the bases for termination of officer Charles were: (1) officer Charles lied by omission in his report regarding the attempted escape of Bernard Barfield in that officer Charles failed to highlight that *he* had left the door of the booking room unlocked; and (2) officer Charles' failed to follow an order to be on hand at Room 183 (as was customary when the club closed for the night) and was untruthful about that failure.

¶ 46     It should be noted that unlike this court, which relies solely on the cold record, the arbitrator heard live testimony from several witnesses and considered exhibits over the course of what was a lengthy hearing. There was ample opportunity to observe the witnesses and determine their credibility and the visual nuances that give the trier of fact an impression of the witnesses and their testimony. Although the arbitrator found that some of officer Charles' statements lacked candor, he did not find that there was a concerted effort to be dishonest as the city of Country Club Hills suggested.  As his attorney explained during oral argument, officer Charles' version of the events was at great variance with the city of Country Club Hills regarding the alleged order for him to be on hand at Room 183 at closing time. The city makes much of the fact that several months elapsed between the time that officer Charles was to have been stationed outside the club and the time of the arbitration hearing.  They reason that if officer Charles had been engaged in the activities that he claimed, there was ample time for him to produce evidence of such activities, but he did not, therefore, that was further proof that he was lying.  On the other hand, the lengthy passage of time may be the very reason that no such proof of his activities on the night in question, is available.  It is not beyond reason or belief for a police officer to be unable to recall with precision, exactly what he was doing on a particular night many months earlier.   Thus, offering an explanation of his *usual* and/or *likely* activities under similar

circumstances does not necessarily equate to dishonesty. Based on the arbitrator's finding, it can reasonably be inferred that he gave some weight to officer Charles' testimony. The result is that there was no clear finding that he had failed to follow an order to go to Room 183.

¶ 47    On the question of officer Charles' written account of the attempted escape by the detainee, Barfield, it is clear that he did not highlight the fact that he had left the door unlocked. However, the content of the report was very factual and nothing in the record suggests that there was any untruth or misleading statements other than the omission of who left the door unlocked. The city's complaint centers around officer Charles' failure to *highlight* the fact that he had left the door unlocked. While the city's interpretation that he lied by omission is certainly reasonable, it is not the *only* interpretation that can be gleaned from his written report. Thus, it can be inferred that the arbitrator recognized that and ruled accordingly.

¶ 48    I agree with the majority that the seminal assumption when reviewing an arbitration order is that the arbitrator, after hearing the facts and presumably applying the law to the facts, entered a valid order. That assumption should, and does, in my opinion, apply with equal force to this case. Here, specifically, the arbitrator found that when all of the evidence, facts, and circumstances were considered, the appropriate sanction for officer Charles was a written warning. I see no reason whatsoever to overturn that ruling.

¶ 49    The majority relies on the public policy exception in overturning the arbitrator and the circuit court of Cook County. The majority correctly applies a *de novo* standard of review to the determination of whether the public policy exception applies. However, application of the *de novo* standard should not equate to substituting the reviewing court's judgment for that of the arbitrator. I agree with officer Charles' argument before this court that the public policy exception is *very* narrow and depends upon the facts of each case. See *Chicago Transit*

*Authority v. Amalgamated Transit Union, Local 241*, 399 Ill. App. 3d 689, 696 (2010). In this case, although the majority has not clearly identified or explained the specific actions of officer Charles which bring this case within the narrow exception, nevertheless, my colleagues have overturned the arbitrator's ruling and entered their own. This is inconsistent with the collective bargaining agreement which mandated arbitration to resolve the very type of conflict that occurred here. And, in my view, is inconsistent with established Illinois case law.

¶ 50    I do not disagree that a law enforcement officer must be held to a high standard of honesty. Indeed, I recently authored an opinion affirming the principle that "the job of a police officer requires the utmost integrity and honesty," on which counsel for the city of Country Club Hills relied during oral argument. See *Rios v. Cook County Sheriff's Merit Board*, 2020 IL App (1st) 191399, ¶ 34. But the officer in *Rios* was terminated after she had a conversation with her incarcerated sibling during which he asked her to engage in witness tampering. *Id.* ¶ 4. Not only did the officer fail to report the conversation, she denied that it even occurred, and admitted the truth only when confronted with the recording. *Id.* ¶ 30. This is a far cry from officer Charles' conduct here. Moreover, in *Rios*, we made clear the substantial deference to be accorded to the Cook County Sheriff's Merit Board findings (*id.* ¶ 33), which is akin to the deference we should accord the arbitrator here.

¶ 51    The majority's reliance on *Village of Oak Lawn v. Human Rights Commission*, 133 Ill. App. 3d 221, 224 (1985), suffers from similar infirmities. In that case, the applicant clearly and intentionally lied on an application designed to gather accurate information about an applicant's fitness to join the police force. That is a very different scenario than the actions of officer Charles in this case. Nevertheless, that case seems to form the basis for the belief by the city of

Country Club Hills and the majority here that officer Charles' conduct warranted nothing less than termination.

¶ 52    I do not agree that under the facts of this case, a breach of the standard of honesty so clearly occurred, that termination was the *only* possible sanction.  In my view, this case is similar to countless cases which come before this court wherein a lower tribunal levied a sanction different from what we may have levied, if we stood in the place of the lower court. In those instances, we do not vacate the sanction and impose the one which we deem appropriate.  Rather, we recognize that as a court of review while we may differ with the lower court regarding the appropriate sentence, as long as the sentence falls within the permissible range for the offense, we may not reverse or vacate it and impose our own simply because we disagree with it.  See, *e.g.*, *People v. Alexander*, 239 Ill. 2d 205, 214 (2010); *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 53    In this case, while the majority claims they are not suggesting that discharge is the *only* sanction for dishonesty, they go on to overturn the arbitrator's ruling on the reasoning that the facts of *this* case warrants such action.  They do not explain what distinguishes this case from others in which discharge may not be an appropriate sanction and in which an arbitrator's ruling would be allowed to stand. The majority's ruling simply says, they thought the sanction was too light in this case and wanted to impose their own sanction, regardless of the arbitrator's findings.

¶ 54    Thus, in my view, although the majority's analytic language says otherwise, their ruling says that discharge is the only sanction that they would accept in a case of police dishonesty even if imposing that sanction requires overturning an otherwise properly entered arbitration finding.  And further, their action makes it clear that they are doing so simply because they disagreed with the arbitrator and wanted a different, more stringent sanction.  I do not believe

that is our role especially under the facts of this case. It is a slippery slope indeed, once this court inserts itself into the array of possible sanctions levied by a lower tribunal in order to determine if "the punishment fits the crime." I hasten to reiterate that a written warning *is* a sanction although the inference from the argument made by the city of Country Club Hills is that officer Charles "got off Scot free." Not so. The arbitrator found the sanction he levied to be the appropriate one under the facts that he had personally heard and reviewed. Although it is clearly not the sanction that the city of Country Club Hills wanted, I can find no support for the position that termination is the *only acceptable sanction* for the lack of candor which the arbitrator found officer Charles to have committed. In fact, a review of the testimony suggests ambiguity in addition to the lack of candor which the arbitrator found. So, there was no clear-cut evidence that the totality of facts and circumstances were so egregious that termination was the only and obvious conclusion at the end of the arbitration process.

¶ 55    Additionally, there has been no suggestion that the arbitrator was biased, acted fraudulently or outside the bounds of his authority. On the contrary, the hearing was lengthy and thorough. The arbitrator acted within the parameters of the collective bargaining agreement and his professional capacity as the trier of fact and levied a sanction which in his judgment, based on the facts and circumstances of this case, was appropriate.

¶ 56    In light of the fact that there is no clear and overwhelming support for the conclusion that this case falls within that narrow exception to the rule which *requires* this court to accept the arbitrator's ruling, I would affirm the arbitrator and the circuit court of Cook County, rather than reverse that ruling and impose a different sanction.

---

**No. 1-20-0546**

---

| | |
|---|---|
| **Cite as:** | *City of Country Club Hills v. Charles*, 2020 IL App (1st) 200546 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CH-13458; the Hon. Michael T. Mullen, Judge, presiding. |

---

| | |
|---|---|
| **Attorney for Appellant:** | John B. Murphey, of Odelson & Sterk, Ltd., of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Ivan M. Rittenberg, of Saks, Robinson & Rittenberg, Ltd. and John T. Moran, Jr., of Moran Law Group, both of Chicago, for appellee. |

---