2025 IL App (1st) 241162-U
No. 1-24-1162

FIRST DIVISION
August 25, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 23 CH 322 |
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 9, | ) ) ) ) | The Honorable Eve M. Reilly, |
| Defendant-Appellee. | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* The circuit court erred in entering summary judgment denying the Metropolitan Water Reclamation District of Greater Chicago's motion to vacate the arbitration award where the arbitrator exceeded his authority by ignoring pertinent terms of the collective bargaining agreements.

¶ 2    Plaintiff Metropolitan Water Reclamation District of Greater Chicago (MWRD) appeals the circuit court's granting of defendant International Brotherhood of Electrical Workers, Local 9's (Union) motion for summary judgment denying MWRD's motion to vacate an arbitration award regarding payments to Union members during a period when MWRD operations were

affected by COVID. On appeal, MWRD contends that (1) the circuit court erred in not vacating the arbitration award because the arbitrator exceeded his authority by not defining the specific term "paid time off" which was the trigger for the facility closure benefits ordered by the arbitrator, and the award failed to draw its essence from the parties' collective bargaining agreements (CBAs); and (2) the award violated Illinois public policy. For the following reasons, we vacate the arbitration award.

¶ 3                                    I. BACKGROUND

¶ 4        MWRD is a unit of local government, which provides wastewater treatment and stormwater management for Chicago and suburbs throughout Cook County. MWRD manages seven wastewater treatment plants which operate continuously throughout the year. During the relevant period of March through October 2020, MWRD had approximately 1740 employees, and approximately 85 of those employees were members of the Union. The Union acted as the exclusive bargaining representative for MWRD's electrical operations, electrical instrumentation and testing, and motor vehicle dispatcher groups.

¶ 5                    A. The Collective Bargaining Agreements

¶ 6        MWRD and the Union were parties to three CBAs for the above groups which were effective from July 1, 2017, through June 30, 2020. The parties extended the effective dates of these CBAs by agreement to June 30, 2021.

¶ 7        The CBAs each included the following relevant provisions:

> "SECTION 2.01 MANAGEMENT RIGHTS. Except as otherwise specifically provided herein, the management of the plant and direction of the work force, including but not limited to *** the right to determine the methods, processes and means of operations are vested exclusively in [MWRD]. *** [The Union] recognizes that the nature of [MWRD's] operations require some degree of flexibility in making work assignments to its employees to meet emergencies.

\*\*\*

SECTION 24.05 FACILITY CLOSURES.[1] When [MWRD] allows paid time off as a result of a facility closure or due to an emergency or other reasons, the following will apply:

1. Full Day District Designated Facility Closure
   a) Non-shift employees who are instructed not to report for work shall receive payroll code 0017—Employee Benefit for the workday.
   b) Non-shift employees who are not working due to a prescheduled paid day off will have their time sheet adjusted to reflect payroll code 0017—Employee Benefit for the workday if work is not available to them due to their work location being closed.
   c) Non-shift employees who are directed to report to work when their work location is closed shall be compensated at 1-1/2 times their hourly rate for all hours worked. Such employees will be coded 0017—Employee Benefit for any regularly scheduled hours not worked during their scheduled workday.

   \*\*\*

   e) Shift employees who are scheduled to report to work and report to work shall receive their regular compensation in addition to payroll code 0026—Holiday Earned for the number of hours worked equal to the paid time off received by non-shift employees in the bargaining unit at their assigned work location, up to a maximum of eight (8) hours holiday earned credit."[2]

¶ 8        The CBAs also contained a section regarding procedures for submitting grievances before the MWRD. The outlined policies provided for a three-step grievance procedure with MWRD, where, if not settled at the third step, either party may request a final and binding arbitration regarding the grievance.

---

[1] This section is numbered 24.05 in the Electrical Operations and Motor Vehicle Dispatcher Group CBAs but is numbered 23.09 in the Electrical Instrumentation and Testing CBA.
[2] This subsection is in the Electrical Operations and Electrical Instrumentation and Testing CBAs but not the Motor Vehicle Dispatched Group CBA. The evidence at the hearing on the grievance merits established that "[f]or the most part," the motor vehicle dispatchers and the electrical instrumentation and testing group were non-shift employees, and the electrical operators were both shift and non-shift employees.

¶ 9                                    B. MWRD Operations During COVID

¶ 10        On March 13, 2020, MWRD's Executive Director determined that MWRD would operate at reduced on-site staffing levels in response to the COVID-19 pandemic. Non-shift employees were sent home, and shift workers who needed to maintain critical operations reported in. As a result, MWRD began paying premium payments to the employees represented by the Union, consistent with the Facility Closure provision of the CBAs. These employees continued to receive premium payments until May 11, 2020, when MWRD ceased paying the facility closure premiums.

¶ 11        The Union filed grievances on behalf of the three groups under the procedures of the CBA, challenging MWRD's decision to stop paying the facility closure premiums. The grievances were processed through the CBA grievance procedures, and were denied at the third step on October 12, 2020. The Union then requested the grievances be advanced to a final and binding arbitration on October 15, 2020.

¶ 12                                    C. January 27, 2021, Arbitration Hearing

¶ 13        On January 27, 2021, the dispute progressed to an arbitration hearing before Arbitrator Brian Clauss regarding the merits of the grievance. The parties agreed that Arbitrator Clauss would first decide the merits of the grievance, and would conduct a separate hearing regarding the remedy if the parties were unable to reach an agreement.

¶ 14        At the hearing on the merits, Union counsel argued that the CBAs established three "triggers" for premium payments under the Facility Closures sections: (1) a facility closure, (2) an emergency, or (3) another reason. Under the contracts, when non-shift employees report to work where their work location is otherwise closed, they will be paid a premium rate of one-and-a-half

times their hourly rate. Similarly, shift employees would get additional holiday pay for reporting to work when their work location is closed.

¶ 15        Union counsel contended that in mid-March, MWRD operated at minimum staffing levels, and employees received premium pay. These premium payments stopped on May 11, 2020, but MWRD operations hadn't changed because most employees were still not reporting to the work site, and were classified as "on call, waiting to be called in by [MWRD], or working remotely." Union members, however, were required to come in to work. During this time, employees who were "on call" or working remotely were being paid using payroll code 17A, which is a code used "for early dismissal due to weather or other special case conditions." The Union presented an office memorandum from April 28, 2020, which stated that as of late April, approximately 15 percent of trades employees were reporting to work each day.

¶ 16        The Union further presented several emails from March 2020, wherein representatives of MWRD defined a facility closure as "minimum staffing" and referenced the language from the CBA provisions regarding Facility Closures regarding employee compensation. When MWRD ceased premium payments, it did so by stating that it was ending the "facility closure compensation." Although some employees returned to the workplace in late May and early June 2020, as of June 5, 2020, 50 percent of trades employees were staying home. As of December 2020, more than 800 employees did not report to work and were paid using pay code 17A.

¶ 17        In December 2019, MWRD had issued a business continuity plan in the event of a public health emergency, wherein essential personnel, such as the Union members, were to be compensated at a premium rate for the entire emergency closing period. However, the plan also noted that for closings longer than one week, "other guidelines may be established." MWRD never attempted to negotiate other guidelines with the Union.

¶ 18    MWRD presented the testimony of Ted Kosowski, MWRD's Assistant Director of Human Resources. Kosowski testified that on March 13, 2020, MWRD's Executive Director worked with the Board of Commissioners to implement a "proactive" approach to quarantine periods in order to protect the workforce, namely, to operate under reduced staffing. At that point, shift workers remained at work. When MWRD first determined they would send employees home, the facility closure language of the CBAs was triggered because they had used that provision in the past during emergency situations. Employees required to physically report to an MWRD worksite were given extra compensation. MWRD was working quickly to implement telecommuting protocols, because few employees prior to March 2020 had access to telecommuting. However, Kosowski testified that the MWRD wastewater treatment facilities never stopped operating during this time and, thus, MWRD "never closes."

¶ 19    On March 13, 2020, MWRD issued a press release telling the public that MWRD wastewater plants were operating and manned "24/7" while the remainder of MWRD employees would be "on call" or telecommuting. On March 16, 2020, the Director of Human Resources sent employees an email regarding compensation. Kosowski described payroll code 17 as a "paid-time-off benefit" for non-shift employees to vote during their working hours, and payroll code 17A allowed employees to have pay under different circumstances, directed by the Executive Director, while other employees were required to be at work. Code 17A was traditionally used for pre-holiday early leave for Thanksgiving or Christmas, and it had also been used to direct employees to stay home during a weather event or to allow employees to leave work early due to a contentious trial which could have caused civil unrest.

¶ 20    On April 17, 2020, MWRD's Director of Human Resources emailed all employees to inform them that non-represented, non-shift employees were to be returned to regular straight-time

pay beginning on April 20, 2020. This decision was made because the pandemic had a longer duration than initially anticipated, and likely would be inconsistent with protocols developed in the 2019 business continuity plan. At this time, a significant portion of MWRD employees were teleworking, so the situation did not resemble a traditional facility closure event, where staff was "not expected to report to work." On May 8, 2020, MWRD determined that on May 10, 2020, the premium pay compensation for all employees, including the represented employees, would cease because plans were made to bring more workers back into the workplace, and more of the workforce had been showing up on site. MWRD made plans to break work groups into two teams, who reported to work on alternating weeks. During that time, the employees who were coded under 17A were on call, needed to be available to come in to work, and were not on paid benefit time. MWRD chose 17A as a payment mechanism rather than the telecommuting time codes because the telecommuting time code "would have required employees to be able to punch in and punch out," and many workers did not have the ability to clock in and out remotely.

¶ 21        Kosowski testified that the distinction between workers who teleworked and those on call arose because some jobs did not "lend themselves to the ability to telework." He commented that the facility closure provision of the CBAs only applied when MWRD allowed paid time off during a facility closure or other emergency, and nobody was getting paid time off unless they used their own personal or vacation time. MWRD's granting of this compensation from March 13 to May 11, 2020, was it "being overly generous to employees" as it determined its response to the pandemic. Kosowski testified that MWRD had the ability to decide when the facility closure began and ended under Section 2.01 of the CBAs. Kosowski did not know who other than a MWRD manager could make the decision about when a facility closed, and because COVID was "an unknown," years could pass before workers stopped being coded using 17A.

¶ 22        MWRD settled with two other unions that filed grievances regarding pay, and extended the settlement agreement to 14 unions. The Union was the only one that did not accept the settlement. If the grievance were sustained, MWRD would have to move money from "critical-funded programs" in order to continue paying the Union employees at the premium rate. Kosowski testified that the 2019 business continuity plan included protocols regarding absenteeism triggered based on workers who would become sick, but the MWRD response to COVID caused MWRD to "scrap" the plan "immediately" because it took the employees out of the workplace before they became sick.

¶ 23        On cross-examination, Kosowski stated that the facility closure provision of the CBAs had historically been applied "for periods of time where there would be an employee benefit awarded to other employees, and employees that were required to still report to work would then be entitled to this additional compensation or premium." Kosowski specified that such cases would be of "short" duration, such as holiday time and weather emergencies, "where there is a beginning and an end." Kosowski acknowledged, however, that the CBA contained no reference to duration, and his understanding of the provision came from its historical application.

¶ 24                        D. June 7, 2021, Arbitration Award

¶ 25        On June 7, 2021, Arbitrator Clauss issued his award, sustaining the Union's grievance. He found that MWRD "changed operations" as a result of the pandemic when it ordered many employees not to report to work in order to protect the workforce and MWRD operations. Accordingly, most employees were not in the workplace, and remained outside the workplace until at least October 2020. Although MWRD argued that a long-term emergency was not contemplated by the emergency closure sections of the CBAs, Arbitrator Clauss noted that the relevant provisions addressed emergency closures "without limitation on duration" and that the December

2019 Business Continuity Plan did not address employee payments, "suggesting that [MWRD] would rely on the language of the CBAs."

¶ 26        Arbitrator Clauss commented that employees "continued to telework, be on call, and to work altered shifts during spring of 2020," and were compensated with payroll code 17A, which did not "distinguish between an employee who [was] telecommuting, an employee on standby, and an employee who [was] working a week on/ week off schedule." MWRD had a separate telecommuting payroll code. Employees continued to be compensated with payroll code 17A after May 11, 2020, although bargaining unit members who reported to work no longer received premium pay after May 11, 2020.

¶ 27        Arbitrator Clauss agreed with the Union position that MWRD was operating under a closure where employees were teleworking, on call, and working week on/week off schedules, and MWRD paid its employees pursuant to the emergency closures provision of the CBAs. Arbitrator Clauss noted that MWRD's communications to employees throughout March through June 2020 acknowledged MWRD's "altered operations" because many employees were not reporting to the workplace, even after the May 2020 return to regular pay. The payroll records did not show which employees remained at home and which employees teleworked, although both categories were paid using payroll code 17A. Although the Business Continuity Plan established that MWRD had the ability to track employees working remotely, it chose not to code them that way, "thereby making them indistinguishable from employees who were ordered not to report to work and entitled to a 17A paycode." Arbitrator Clauss also commented that "[o]f course," MWRD had the right to determine its operations, but the management rights section of the CBAs did not establish that it could define a closure. According to the CBAs, premium payments occur when MWRD "allows paid time off as a result of a facility closure due to an emergency, or other reason." Here,

the evidence showed MWRD employees "were allowed paid time off after May 11, 2020, due to the pandemic."

¶ 28    By agreement of the parties, Arbitrator Clauss remanded the matter to the parties for remedy, but he retained jurisdiction for 90 days "in order to resolve any remedy dispute."

¶ 29                                  E. April 13, 2022, Remedy Hearing

¶ 30    The parties did not agree on a remedy, so the matter proceeded to a remedy hearing on April 13, 2022, before Arbitrator Clauss. The parties also submitted post-hearing briefs to address the issue. MWRD argued that facility closure benefits should be awarded through May 29, 2020, the same date through which the other unions agreed to receive premium payments pursuant to the settlement agreements. Otherwise, MWRD argued that benefits should cease on July 6, 2020, because 100 percent of maintenance and operations trades employees had returned to work at the plants and were no longer on call. The Union argued that damages be awarded through June 7, 2021, which is the date that Arbitrator Clauss issued his award, and requested that MWRD be ordered to properly code teleworking employees using the telework pay code, rather than under 17A.

¶ 31    On October 14, 2022, Arbitrator Clauss rejected both proposed positions regarding a remedy, and instead ordered that MWRD pay facility closure benefits to Union members through October 1, 2020. Arbitrator Clauss came to this conclusion, because the evidence established that many employees remained outside the workplace and received pay under pay code 17A until that date. Arbitrator Clauss also commented that the matter of using the telework pay code rather than 17A was "a matter best resolved in negotiations," but noted that MWRD "has seen the cost of ignoring the Facility Closure language and the repercussions of an imperfect Facility Closure Policy."

¶ 32                                    F. Circuit Court Proceedings

¶ 33          On January 12, 2023, MWRD filed a petition to vacate the arbitration award in the circuit court of Cook County. MWRD argued that Arbitrator Clauss's interpretation of the CBAs was "not possible," as it ignored the trigger of "paid time off" for facility closure benefits because the MWRD did not allow employees paid time off as of May 11, 2020. MWRD further argued that Arbitrator Clauss exceeded his authority by changing the terms of the CBAs, such that the award did not "draw its essence" from the CBAs. MWRD alternatively contended that the award violated public policy where the award provided a salary windfall to the Union members that they did not earn.

¶ 34          On March 13, 2023, the Union answered MWRD's petition and argued that the petition was untimely because it was filed more than 90 days after the June 7, 2021, arbitration award. The Union also argued that the petition failed to state a claim upon which relief could be granted.

¶ 35          On September 11, 2023, the Union filed a motion for summary judgment, arguing that (1) MWRD's challenge to the June 7, 2021, arbitration award is untimely, and (2) Arbitrator Clauss acted within the scope of his authority and the award drew its essence from the CBAs. The Union argued that, accordingly, the circuit court was "duty bound" to enforce the award. The Union contended that MWRD's motion to vacate constituted an attempt to relitigate the issues presented to Arbitrator Clauss, which was an improper expansion of the circuit court's review of the award, and MWRD's public policy argument was baseless.

¶ 36          That same day, MWRD filed a cross-motion for summary judgment, arguing that Arbitrator Clauss disregarded that the CBA facility closure provision only authorized premium pay where MWRD allowed paid time off. Additionally, MWRD argued that because Arbitrator Clauss failed to construe the meaning of the term "paid time off," and "ignored" MWRD's right

to determine the end of the facility closure, his award did not draw from the essence of the CBAs. MWRD also argued that Illinois public policy supported vacatur because the award produced an "enormous financial windfall" to Union employees, putting the onus on the taxpayers.

¶ 37    The matter proceeded to a hearing on November 30, 2023. The circuit court took the matter under advisement, and issued its order granting the Union's motion for summary judgment and denying MWRD's motion on May 1, 2024. The court found that Arbitrator Clauss was "empowered" by the CBAs to interpret and apply the following undefined terms: "allows paid time off," and "facility closure." The court noted that although Arbitrator Clauss failed to explicitly define the terms in his ruling, his ruling applied the terms to the given facts. The court found that in interpreting "paid time off," Arbitrator Clauss "analyzed employees' work status ***, as well as the use of the 17A payroll code" for employees who did not work onsite from March 13, 2020, through October 1, 2020. Arbitrator Clauss acknowledged that MWRD was operating under a facility emergency closure and paid premium pay until May 2020, and noted that employees worked week on/week off schedules but still received pay. The court concluded that MWRD simply disagreed with Arbitrator Clauss's construction and application of the CBA terms, and failed to show by clear and convincing evidence that he exceeded his authority in interpreting the CBAs. Additionally, the court found that Arbitrator Clauss did not disregard MWRD's managerial rights in determining his award, and MWRD failed to show that the award violated public policy.

¶ 38                                    II. ANALYSIS

¶ 39    On appeal, MWRD argues that (1) Arbitrator Clauss exceeded his authority by failing to define and apply the term "paid time off," and ordering MWRD to pay facility closure benefits through October 1, 2020, and (2) the award failed to draw its essence from the CBAs because Arbitrator Clauss relied upon sources outside off the CBAs. Alternatively, MWRD contends that

the award violated Illinois public policy by requiring MWRD to pay employee wages and salaries which were not "lawfully due."

¶ 40 The parties filed cross-motions for summary judgment, so they agreed "that only a question of law is involved and invite[d] the court to decide the issues based on the record." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. We review the circuit court's decision regarding cross-motions for summary judgment *de novo*. *City of Country Club Hills v. Charles*, 2020 IL App (1st) 200546, ¶ 20.

¶ 41 A. Timeliness

¶ 42 As an initial matter, the Union argues that MWRD untimely filed its petition to vacate the arbitration award, which barred the circuit court from considering the merits of MWRD's petition to vacate. The Union contends MWRD filed its petition to vacate the arbitration award on January 12, 2023, well beyond 90 days after the issuance of the June 7, 2021, arbitration award. MWRD contends that the June 7, 2021, award only determined liability and not the remedy, and so the ruling was interlocutory in nature. Accordingly, MWRD argues that it timely filed its petition to vacate the award within 90 days of Arbitrator Clauss's October 14, 2022, remedy award. We agree with MWRD.

¶ 43 The Illinois Uniform Arbitration Act (Act) provides the procedure for the limited circumstances under which a court may modify or vacate an arbitration award. *Kenny v. Kenny Industries, Inc.*, 406 Ill. App. 3d 56, 62 (2010). Under the Act, a party may apply to vacate the final arbitration award in the circuit court "within 90 days after delivery of a copy of the award to the applicant." 710 ILCS 5/12(b) (West 2020). However, "the Act does not provide a mechanism for review of interlocutory orders by the arbitrators." *Klehr v. Illinois Farmers Insurance Co.*, 2013 IL App (1st) 121843, ¶ 8.

¶ 44        "Given the common origins of the Federal and uniform statutes, courts interpreting State arbitration statutes patterned after the Uniform Arbitration Act look for guidance to Federal court decisions interpreting similar provision[s] of the Federal Arbitration Act." *Radiant Star Enterprises, LLC v. Metropolis Condominium Association*, 2018 IL App (1st) 171844, ¶ 58, n. 8 (quoting *J&K Cement Construction, Inc. v. Montalbano Builders, Inc.*, 119 Ill. App. 3d 663, 668 (1983)). Additionally, the Act is "to be construed so as to make uniform the law of those states which enact it," so opinions of courts of other jurisdictions are shown greater than usual deference. (Internal quotation marks omitted.) *Id*. (quoting *Garver v. Ferguson*, 76 Ill. 2d 1, 8 (1979)).

¶ 45        Federal cases interpreting this issue have determined that "if the arbitrator himself thinks he's through with the case, then his award is final and appealable." *Smart v. International Brotherhood of Electrical Workers, Local 702*, 315 F. 3d 721, 725 (7th Cir. 2002). To that end, a court should only confirm a final and binding arbitration award, which is "intended by the arbitrator to be his complete determination of every issue submitted to him." *Ameritech Services, Inc. v. Local Union No. 336, International Brotherhood of Electrical Workers*, No. 96 C 5897, * 5 (Apr. 30, 1997). See also *McKinney Restoration Co., Inc., et al. v. Illinois District Council No. 1 of the International Union of Bricklayers and Allied Craftworkers, AFL-CIO, et al.*, 392 F. 3d 867, 871-72 (2004) (discussing *Smart* and *Ameritech* with respect to the "complete arbitration" rule). This rule exists to forestall piecemeal litigation and ensure finality between the parties. *Ameritech*, No. 96 C 5897, * 7.

¶ 46        Here, Arbitrator Clauss's June 7, 2021, arbitration award was not a final award as it did not determine the remedy. Instead, the parties agreed to resolve the matter of the remedy, with Arbitrator Clauss retaining jurisdiction for 90 days in order to resolve any remedy dispute that arose. This scenario played out as the parties could not come to a resolution themselves, so

Arbitrator Clauss ultimately determined the remedy. Clearly, Arbitrator Clauss did not believe that the June 7, 2021, award was "final" as he otherwise would not have retained jurisdiction to address the remedy. See *Smart*, 315 F. 3d at 725; see also *Ameritech*, No. 96 C 5897, * 5 (finding the arbitration award not final where the arbitrator deferred determination of the remedy in the hope that the parties could resolve the issue among themselves). It would have been premature for MWRD to appeal the June 7, 2021, award. Accordingly, MWRD's petition to vacate the arbitration award was timely filed within 90 days from the entry of the October 14, 2022, remedy award. We, thus, proceed to the merits of the appeal.

¶ 47                              B. Judicial Review of Arbitration Awards

¶ 48          Judicial review of an arbitrator's award is "extremely limited." *Griggsville-Perry Community Unit School District No. 4 v. Illinois Educational Labor Relations Board*, 2013 IL 113721, ¶ 18. "[W]e must enforce a labor-arbitration award if the arbitrator acts within the scope of his or her authority and the award draws its essence from the parties' collective-bargaining agreement." (Internal quotation marks omitted.) *Forest Preserve District of Cook County v. Illinois Fraternal Order of Police Labor Council*, 2017 IL App (1st) 161499, ¶ 19. There is a presumption that the arbitrator has not exceeded his or her authority and, thus, a reviewing court must construe the award as valid, if possible. *Western Illinois University v. Illinois Educational Labor Relations Board*, 2021 IL 126082, ¶ 56. We will not overrule the arbitrator's construction of the contract merely because our interpretation differs from that of the arbitrator. *AFSCME, AFL-CIO v. Department of Central Management Services*, 173 Ill. 2d 299, 305 (1996). "Nonetheless, a court may vacate an award if a gross error of law or fact appears on the face of the award." (Internal quotation marks omitted.) *First Health Group Corp. v. Ruddick*, 393 Ill. App. 3d 40, 52-53 (2009).

Whether an arbitrator exceeded his or her authority is a question of law which we review *de novo*. *Western Illinois University*, 2021 IL 126082, ¶ 56.

¶ 49 An arbitrator may only interpret and apply the collective bargaining agreement, rather than "dispense his own brand of industrial justice." (Internal quotation marks omitted.) *Griggsville-Perry*, 2013 IL 113721, ¶ 19. An arbitrator may look for guidance from other sources, but his or her award "is legitimate only so long as it draws its essence from the collective bargaining agreement." *Id*. Finding that an arbitrator has failed to interpret the collective bargaining agreement is a "high hurdle," and it is not enough to show that he or she committed "a serious error," but it must be shown that "there is no interpretative route to the award, so a noncontractual basis can be inferred and the award set aside. [Citations.] The zanier the award, the less plausible it becomes to ascribe it to a mere error in interpretation rather than to a willful disregard of the contract." (Internal quotation marks omitted.) *Id*. ¶ 20. In other words, the award will be overturned "where the arbitrator based his award on a body of thought, feeling, policy, or law *outside* of the contract." (Emphasis in original.) *Amalgamated Transit Union, Local 241 v. Chicago Transit Authority*, 342 Ill. App. 3d 176, 180 (2003).

¶ 50 C. Whether Arbitrator Clauss exceeded his authority

¶ 51 Here, Arbitrator Clauss exceeded his authority in determining that MWRD was operating under a closure from May through October 2020 and, thus, ordering MWRD to pay premium pay to Union employees during that time. As noted, finding that an arbitrator has failed to interpret the collective bargaining agreement is a "high hurdle," but it is one that has been met under the circumstances of this case. See *Griggsville-Perry*, 2013 IL 113721, ¶ 20.

¶ 52 First, Arbitrator Clauss has made a gross error of judgment on the face of the award by ignoring the term "paid time off" in the facility closure provisions of the CBAs. See *First Merit*

*Realty Services, Inc. v. Amberly Square Apartments, L.P.*, 373 Ill. App. 3d 457, 462 (2007) (finding an error in judgment apparent on the face of the award where the arbitrators ignored the plain language of the contract). According to the CBAs, a non-shift employee who reports to work during a facility closure will receive premium pay only when MWRD allows paid time off as a result of that closure or due to an emergency or other reasons. Arbitrator Clauss did not interpret this provision correctly, as he ignored this necessary trigger. The evidence established that after May 11, 2020, MWRD employees were either (1) working on site, including on altered schedules, (2) working remotely, or (3) available "on call." Kosowski testified at the January 27, 2021, arbitration hearing that after May 11, 2020, no employees were receiving paid time off unless they used their own personal or vacation time. Arbitrator Clauss conclusorily noted in his arbitration award that MWRD employees received paid time off, but the evidence presented at the arbitration hearing belied that conclusion, as the employees were working or "on call," rather than on vacation.

¶ 53    Arbitrator Clauss also exceeded his authority by determining that the MWRD facilities remained closed in May 2020, when the evidence established that MWRD was implementing its plan for continued operations during the pandemic. It is undisputed that from March through early May 2020, MWRD provided premium pay to its Union employees working in person as the workforce was operating at minimum staffing levels. During the next two months, however, MWRD established its pandemic protocols and began transitioning workers back to the workplace. As the management rights section of the CBAs establishes, "the management of the plant and direction of the work force, including *** the right to determine the methods, processes and means of operations are vested exclusively in [MWRD]." Further, The Union "recognizes that the nature of [MWRD's] operations require some degree of flexibility in making work assignments to its

employees to meet emergencies." That is what happened here. MWRD implemented a "generous" compensation scheme from March 13 to May 11, 2020, before it developed its policies regarding COVID. Kosowski testified at the hearing that MWRD had the ability to decide when the facility closure began and ended under the CBAs. A plain reading of the language from the CBAs supports this conclusion.

¶ 54       In his arbitration award, Arbitrator Clauss noted that "[o]f course" MWRD had the management right to determine its operations, but the CBAs did not support MWRD's conclusion that it could define a closure. However, Arbitrator Clauss did not acknowledge the language of the CBAs, including the Union's recognition that flexibility in making work assignments be required during emergencies. The arbitrator's use of the phrase "altered operations," to define the status of MWRD facilities provides support for its continued, albeit altered, operations during this time. In determining that facilities remained "closed," Arbitrator Clauss ignored the relevant management provisions of the CBAs and, thus, dispensed "his own brand of industrial justice" in continuing premium payments to Union employees. See *Griggsville-Perry*, 2013 IL 113721, ¶ 19.

¶ 55       The Union contends that Arbitrator Clauss acted within the scope of his authority and the awards drew their essence from the CBAs, and so we are "duty bound" to confirm the award. In arguing this, the Union emphasizes the extremely limited circumstances under which an arbitration award may be vacated. It argues that MWRD merely disagrees with Arbitrator Clauss's construction and application of the relevant terms, which is an impermissible basis for vacatur. See *AFSCME*, 173 Ill. 2d at 305. However, despite the Union's position, Arbitrator Clauss made a gross error in judgment apparent on the face of the award by ignoring pertinent terms in the CBAs, as outlined above. Such errors in judgment establish that Arbitrator Clauss exceeded his authority as the arbitration award was not grounded on the parties' CBAs. See *First Merit Realty*

*Services, Inc.*, 373 Ill. App. 3d at 462-63. As such, we are compelled to vacate the arbitration award. See *Griggsville-Perry*, 2013 IL 113721, ¶¶ 19-20.

¶ 56    MWRD alternatively argues that the arbitration award did not draw its essence from the parties CBAs where it relied on sources and terms contained outside the CBAs, and the award was against Illinois public policy. As we have found a basis to vacate the award due to Arbitrator Clauss exceeding his authority, we need not address these alternative arguments.

¶ 57                                III. CONCLUSION

¶ 58    For the foregoing reasons, we reverse the circuit court's order granting summary judgment to the Union and denying summary judgment to MWRD. We vacate the June 7, 2021, arbitration award and October 14, 2022, remedy award.

¶ 59    Reversed and vacated.