THE CITY OF HIGHLAND PARK, Plaintiff-Appellee, v. TEAMSTER LOCAL UNION No. 714, Defendant-Appellant.

Second District   No. 2—04—0653

Opinion filed April 26, 2005.

Robert Costello, of Sacks, Goreczny, Maslanka & Costello, P.C., of Chicago, for appellant.

Mark A. Stang and Steven M. Elrod, both of Holland & Knight, L.L.P., of Chicago, for appellee.

JUSTICE CALLUM delivered the opinion of the court:

Plaintiff, the City of Highland Park (the City), terminated Martin Stumpf, a police officer, after a jury found him guilty of one count of criminal trespass to a vehicle (720 ILCS 5/21—2 (West 2000)), a Class A misdemeanor. Defendant, Teamster Local Union No. 714 (the Union), filed a grievance on Stumpf's behalf. An arbitrator held that the firing violated the parties' collective bargaining agreement (CBA), and he reinstated Stumpf. The trial court vacated the arbitrator's decision, holding that it violated public policy. The Union appeals. We reverse the trial court and reinstate the arbitrator's decision.

The incident that gave rise to this case occurred on April 15, 2001. Many of the facts are in dispute, but the parties agree on the follow-

ing. At about 8 p.m., Stumpf and his wife, Christina, were driving home separately on Route 45 in Grayslake. (From now on, we refer to Martin Stumpf as "Stumpf.") Stumpf was off duty, dressed in plainclothes, and driving his personal car. Christina was in front, with several vehicles in between them. A van driven by Christopher Tyran (Tyran), and occupied by his wife Lisa and their two children, accidentally bumped Christina's car. Both vehicles were traveling slowly, and there were no injuries and slight damage. Tyran and Christina exited their vehicles and exchanged words. Shortly afterward, Stumpf drove up, exited his car, showed Tyran his badge, and asked for Tyran's driver's license. A short time later, Stumpf went to the passenger's side, reached in, and tried to prevent Tyran from driving the van. Stumpf and the Tyrans disagreed whether Stumpf touched or grabbed Lisa Tyran. Eventually, Stumpf and Tyran each called the Grayslake police to complain about the other's conduct.

On or about June 5, 2001, Stumpf was charged with seven offenses, including the count of criminal trespass to a vehicle, a count of battery to Lisa Tyran, and several counts of disorderly conduct. (Precisely what charges were brought is not clear from the record.) On June 5, 2001, Stumpf was placed on paid administrative leave. Commander David Schwarz and Sergeant Gerald Halley of the Highland Park police department investigated the incident. The Tyrans gave statements. Schwarz and Halley questioned Stumpf. On August 9, 2001, the investigators forwarded a report to Chief of Police Daniel Dahlberg. We summarize the report.

The Tyrans stated as follows. At the time of the accident, their two children, ages five and three, were in the backseat of the van. Stumpf arrived, approached Tyran, showed him his police officer's badge, and asked Tyran to provide his driver's license. Tyran refused. Stumpf said that he would call the police, and he made a call on his cell phone. Tyran closed his window. Stumpf started pounding the window and shouting, "You hit my f---ing wife's car." Tyran decided to leave and call the police. As Tyran started to drive off, Stumpf opened the van's passenger-side door, reached for the keys, pushed Lisa Tyran, and momentarily grabbed her arm. The Tyrans' children were screaming. Stumpf could not get the keys, and the Tyrans closed and locked the door.

Officer Stumpf stated as follows. He did not witness the accident. When he arrived at the scene, Christina told him that Tyran had hit her car. Stumpf spoke to Tyran and asked for his driver's license. Tyran said "F--- you" and rolled up the window. Stumpf repeated his request, but to no avail. Stumpf did not hit the driver's-side window. Tyran then started driving the van in the direction of Christina's car,

which was blocking it in. Stumpf displayed his badge while dialing 9-1-1 on his cell phone and told Tyran not to leave. The dispatcher told Stumpf to get the van's license number. As Stumpf walked to the rear of the van, it went into reverse. Stumpf stated he thought he was going to get hit by the van so he moved out of the way. The van then started moving straight toward Christina's car. Stumpf stated he believed the driver of the van was going to ram his wife's car, so Stumpf, without touching Lisa Tyran, reached into the van through the passenger's-side window for the keys. Tyran stopped the van, and Stumpf immediately backed out of it. Tyran drove off.

The report noted that Stumpf now claimed that he entered the van to prevent it from striking Christina's car. The report notes that when Stumpf spoke to Officer Heimos of the Grayslake police department shortly after the incident, he never indicated that Tyran had tried to hit Christina's car or that he entered the van in order to prevent it from striking Christina or her car. The investigators in the report also note that shortly after the incident, Stumpf related the incident in front of Halley and again to a department clerk but never said that Tyran had tried to run over him or Christina. Finally the report notes that in his 9-1-1 call, Stumpf never said that Tyran had attempted to strike him or Christina. The investigators noted that Heimos said that Stumpf admitted that he grabbed Lisa Tyran's arm but that Stumpf denied having made that admission.

The investigators concluded that Stumpf violated numerous department regulations and City civil-service rules and that he was "not truthful" when he denied making contact with Lisa Tyran. The investigators recommended that Stumpf be suspended from his duties for 18 working days. The City accepted the recommendation and, on October 2, 2001, suspended Stumpf without pay from October 12, 2001, through November 4, 2001. Stumpf did not contest this discipline. On April 1, 2002, a jury found Stumpf guilty of criminal trespass to a vehicle but acquitted him of the other charges. He received a year of court supervision. On May 30, 2002, Stumpf was notified that Dahlberg had asked the City to terminate him. Stumpf filed a grievance, alleging that, under the CBA, the City lacked just cause to fire him. The City denied the grievance. On January 31, 2003, the cause proceeded to an arbitration hearing. We summarize the proceedings at the hearing.

Christopher Tyran testified that, shortly after the incident, he asked the State's Attorney's office to prosecute Stumpf. Lisa Tyran testified that the April 15, 2001, incident was "scary" because Stumpf pounded on the window and entered the van while two small children were inside it.

Sergeant Halley testified that he had been Stumpf's coworker and supervisor. The morning after the incident, Stumpf reported it, saying that Tyran twice rammed Christina's car. Stumpf wanted Tyran to be charged criminally. Halley talked to the Tyrans by phone, prepared a report based on the talk, and met with them at the police station, where the Tyrans filed a complaint.

The City moved to admit Halley's report into evidence. The Union objected that, as the City terminated Stumpf solely because he was found guilty of a crime, the specifics of his conduct were irrelevant to the issue of just cause. The City responded that the report was "strictly for background," to show that the City had acted in good faith. The following exchange ensued:

"THE ARBITRATOR: I am telling you it is not an issue. I am not concerned about the investigation. It is—the City made a decision to discharge after the criminal proceeding. And there was a result from that criminal proceeding. Why do I need to know anything other than that?

MR. YASTROW [counsel for City]: Because the facts are not as— cannot be compartmentalized the same way that the penalties can.

THE ARBITRATOR: What I am trying to avoid is to get a fight—an evidentiary fight over what happened on April 15th. It happened, and there was a criminal proceeding. And the department and the City took the position that this was[,] after the criminal proceeding[,] a dischargeable offense."

The arbitrator reasoned that Stumpf was fired because he was guilty of a criminal offense and not because of the specific conduct that underlay the offense; thus, the report was irrelevant.[1]

Halley continued his testimony as follows. After speaking with the Tyrans, he contacted the Grayslake police department and obtained the 9-1-1 tapes and Heimos's investigative report. Halley and Schwartz investigated and submitted a report. Dahlberg accepted their recommendation that Stumpf be suspended. Stumpf was notified that he would be suspended from October 12 through November 4, 2001. He did not contest the decision. After Stumpf completed the suspension, he went back onto administrative leave. On April 1, 2001, a jury found him guilty of criminal trespass to a motor vehicle. After learning of the verdict, the City moved to terminate Stumpf.

Daniel Dahlberg, the City's chief of police when Stumpf was suspended and fired, testified as follows. In October 2001, when

---

[1]Because Stumpf was placed on supervision, the trial court did not enter a judgment of conviction, and Stumpf was given the opportunity to have the remaining charge dismissed if he successfully completed supervision. See 730 ILCS 5/5—6—3.1(d), (e) (West 2000).

Stumpf was suspended, the criminal case was still pending. Had Stumpf been acquitted of all of the charges, Dahlberg would not have lifted the suspension, as Stumpf had still violated the department's "general orders and rules of conduct." In April 2002, after Stumpf was found guilty of criminal trespass to a vehicle, Dahlberg filed charges asking that Stumpf be fired. Had Stumpf been acquitted of all of the criminal charges, "[h]e would have been able to return to work full duty." However, after Stumpf was found guilty, discharging him was necessary. Allowing him to continue on the force would have had a "dramatic impact" on departmental discipline because "there is no place for criminal activity in law enforcement."

Ronald Janota, a consultant on "law enforcement matters," testified as follows. All police departments have rules for disciplining officers who commit crimes while off duty. Generally, if an officer is found guilty of committing a crime off duty, the department will seek his termination. Otherwise, the public loses respect not only for the officer but for the whole department, making law enforcement far more difficult. When the City's attorney asked Janota whether he had an opinion about the propriety of the decision to seek Stumpf's termination, the Union objected. The arbitrator sustained the objection, explaining that the issue in the case was whether the City acted with just cause and that the opinions of expert witnesses (for either side) were irrelevant.

The arbitrator admitted the transcripts of the criminal trial into evidence. Stumpf then testified as follows. The City hired him as a police officer in October 1988. Other than in October 2001, he had never been suspended. In the criminal case, Stumpf was found guilty of criminal trespass to a vehicle, acquitted of six other charges, including several of disorderly conduct, and given supervision. No judgment of conviction was entered, and he had not been charged with violating the terms of his supervision. Stumpf believed that the police department's investigation of him was "improperly motivated," and he disagreed with the jury's finding that he was guilty of a crime in entering the Tyran van. Stumpf believed at the time that his actions were necessary, and he still did.

The arbitrator held that Stumpf had not been terminated for just cause, and he reinstated Stumpf. The arbitrator's written opinion recited the agreed facts but did not attempt to resolve the disputed aspects of the April 15, 2001, incident. In holding that the City had not shown just cause, the arbitrator reasoned that, because the City had already suspended Stumpf for the same conduct, the termination subjected Stumpf to impermissible "double jeopardy." See *Messina v. City of Chicago*, 145 Ill. App. 3d 549, 557 (1986). The arbitrator also

found that Stumpf could be rehabilitated. The arbitrator noted that, until April 2001, Stumpf had served almost 13 years with no disciplinary suspensions and that the City originally chose to suspend Stumpf for 18 days even though it could have taken far more drastic action. The discipline that the City did impose was sufficient to warn Stumpf that he would have to follow his employer's rules. To ensure that Stumpf would not repeat his improper conduct, the arbitrator allowed the City to require Stumpf to submit to an employee evaluation with emphasis on anger management. If the City exercised this option, Stumpf would be required to comply with any program that the City deemed proper.

The City sought judicial review of the arbitrator's decision (see 710 ILCS 5/12 (West 2002)), asserting in part that the reinstatement of Stumpf violated the State's "well defined and dominant public policies" of protecting the public from illegal conduct by police officers and providing safe and effective law enforcement. The City also asserted that the arbitrator had erred in finding that Stumpf was capable of rehabilitation. The City noted that, although a jury found him guilty of a Class A misdemeanor, Stumpf always denied having done anything improper.

The trial court vacated the arbitrator's award. The court disagreed with the arbitrator's conclusion that terminating Stumpf subjected him to "double jeopardy," as the initial 18-day suspension was not intended as final punishment. However, the court recognized that it was bound by the arbitrator's construction of the CBA. Thus, even had the arbitrator misapplied the double jeopardy doctrine, his award could not be overturned for that reason.

However, the court did hold that enforcing the CBA, as interpreted by the arbitrator, would violate what Illinois courts had declared to be the public policy of promoting effective law enforcement by assuring public confidence in law enforcement officers. See *State Police v. Fraternal Order of Police Troopers Lodge No. 41*, 323 Ill. App. 3d 322, 329 (2001); *Davenport v. Board of Fire & Police Commissioners*, 2 Ill. App. 3d 864, 869 (1972). The court cited pronouncements that a police officer who disobeys the law undermines the discipline and efficiency of his entire department. See *Duncan v. City of Highland Board of Police & Fire Commissioners*, 338 Ill. App. 3d 731, 737 (2003); *Kappel v. Police Board*, 220 Ill. App. 3d 580, 591 (1991).

The court declined to hold that public policy forbade the continued employment of "any police officer convicted of any crime"; for example, an officer's conviction of littering would probably not undermine the functioning of his department or affect the public's confidence in law enforcement. However, the court could not say the

same of Stumpf's offense, a Class A misdemeanor affecting members of the public, including two small children. Quoting testimony from the criminal trial, the court concluded that Stumpf was "the aggressor" who banged on Tyran's window two to three times while screaming "You hit my wife's car." The court discounted the measures that the arbitrator took to ensure that Stumpf would be rehabilitated; anger management training was pointless because Stumpf had acted not out of anger but out of a firm belief that he was right. After the trial court vacated the arbitrator's decision, the Union timely appealed.

The Union argues that (1) the trial court erred in holding that there is a well-defined public policy that would override the arbitrator's construction of the CBA and bar Stumpf's reinstatement; and (2) even if such a policy exists, reinstatement was proper because the arbitrator rationally found that Stumpf could be trusted to refrain from the offending conduct. We agree with both contentions of error, and we reverse the trial court and reinstate the arbitrator's award.

■ An arbitration award that contravenes paramount considerations of public policy is not enforceable. *American Federation of State, County & Municipal Employees v. Illinois*, 124 Ill. 2d 246, 260 (1988) (*AFSCME*). The "public policy" exception is narrow and its successful invocation requires a clear showing that the award violates some explicit public policy. *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 307 (1996) (*DuBose*). "[T]he public policy must be 'well-defined and dominant' and ascertainable 'by reference to the laws and legal precedents and not from generalized considerations of supposed public interests.' " *DuBose*, 173 Ill. 2d at 307, quoting *W.R. Grace & Co. v. Local Union No. 759*, 461 U.S. 757, 766, 76 L. Ed. 2d 298, 307, 103 S. Ct. 2177, 2183 (1983).

*AFSCME* and *DuBose* are the principal Illinois Supreme Court opinions to interpret and apply the "public policy" doctrine. In *AFSCME*, the Department of Mental Health discharged two employees of a state mental health facility because they made an unauthorized trip outside the facility. During their absence, a resident of the facility was left unattended and died. However, the misbehaving employees were not assigned to the wing where he resided. An arbitrator reduced the employees' discipline to lengthy suspensions. The arbitrator explained that they had otherwise been exemplary employees; they admitted their wrongdoing; there was no direct link between their misconduct and the resident's death; and they could return to work without being likely to repeat their improper conduct. *AFSCME*, 124 Ill. 2d at 250-52.

The supreme court upheld the arbitrator's decision. While acknowledging "the important public policy of this State's commitment to compassionate care for the mentally disabled," the court nonetheless could not discern "any explicit public policy that is well defined and dominant." *AFSCME*, 124 Ill. 2d at 262-63. No policy required "the discharge of all employees found guilty of mistreatment of a service recipient when the arbitrator expressly finds that the grievants were exemplary mental health employees, when punishment has been imposed, and where no nexis [sic] exists between the infraction and the patient's tragic death." *AFSCME*, 124 Ill. 2d at 263. The court stressed that the arbitrator's decision meted out substantial punishment for the employees' misconduct, and thus did not condone their actions, and that the arbitrator expressly found that the employees were not likely to repeat their offending conduct. *AFSCME*, 124 Ill. 2d at 263-64.

In *DuBose*, by contrast, the supreme court held that the arbitrator's reinstatement of an employee violated public policy. DuBose, a caseworker for the Department of Children and Family Services (DCFS), was fired because she falsified a report about three children to whose case she had been assigned and failed for years to submit case plans for the children. An arbitrator reinstated her. *DuBose*, 173 Ill. 2d at 301-02. In overturning the reinstatement, the supreme court first ruled that the case involved an "explicit public policy" (*DuBose*, 173 Ill. 2d at 307) embodied in a wide array of statutes and judicial decisions that charged state agencies including DCFS with enforcing the state's "strong interest in protecting children when the potential for abuse or neglect exists." *DuBose*, 173 Ill. 2d at 312. The court discerned a settled policy "against DCFS's employment of individuals whose dishonesty and neglect could seriously undermine the welfare, safety, and protection of minors." *DuBose*, 173 Ill. 2d at 316. Even if the reinstatement did not violate any explicit legal command, it contravened the law's implicit assumption that someone as demonstrably unfit for her duties as was DuBose will not be hired. *DuBose*, 173 Ill. 2d at 320-21.

The court proceeded to the second part of its analysis. It recognized that, under *AFSCME* and federal cases applying the public-policy doctrine, an arbitrator's reinstatement of an employee such as DuBose must be upheld "as long as the arbitrator makes a rational finding that the employee can be trusted to refrain from the offending conduct." *DuBose*, 173 Ill. 2d at 322; see also *Northwest Airlines, Inc. v. Air Line Pilots Ass'n, International*, 808 F.2d 76 (D.C. Cir. 1987); *E.I. DuPont de Nemours & Co. v. Grasselli Employees Independent Ass'n of East Chicago, Inc.*, 790 F.2d 611 (7th Cir. 1986). In *DuBose*,

however, the arbitrator had made no such finding. *DuBose*, 173 Ill. 2d at 323, 332. Thus, the arbitrator's decision could not stand.

Applying *AFSCME* and *DuBose* to the case at bar, we conclude first that the trial court erred in holding that there is an "explicit public policy" that governs this case.

The City does not claim, and the trial court did not hold, that the reinstatement of Stumpf violated any explicit requirement of the law. We have found nothing in our state's statutes or case law that *directly* required the City to terminate Stumpf because he had been found guilty. Of course, the reinstatement of an employee may violate public policy without transgressing positive law. *DuBose*, 173 Ill. 2d at 320-21. Nonetheless, absent an explicit legal prohibition against the reinstatement, there must be some well-defined and dominant policy, not merely a value judgment or notion of the public interest, that implicitly forbids the employee's reinstatement. In *DuBose*, such an implication arose from (1) the extensive and "comprehensive legislative scheme" that served a vital state interest (*DuBose*, 173 Ill. 2d at 315) and (2) the fact that the misconduct " 'went to the heart of the worker's responsibilities' " (*DuBose*, 173 Ill. 2d at 310, quoting *United States Postal Service v. American Postal Workers Union*, 736 F.2d 822, 825 (1st Cir. 1984)) and was grossly inconsistent with achieving the aims of the legislative scheme.

In *AFSCME*, by contrast, while the type of misconduct involved violated the work rules of a state agency and tended to undermine "the important public policy of this State's commitment to compassionate care for the mentally disabled" (*AFSCME*, 124 Ill. 2d at 262), there was simply no policy that mandated the discharge of the employees under the circumstances of the case. *AFSCME* thus holds that the reinstatement of an employee who has violated an important public policy does not necessarily itself violate public policy.

Here, the trial court determined that reinstating Stumpf after he was found guilty of a Class A misdemeanor violated the public policy in favor of effective and disciplined law enforcement. However, the trial court recognized, as does the City, that a police officer's violation of the laws that he is sworn to uphold does not, *ipso facto*, require his termination. The trial court acknowledged that not all offenses are likely to undermine the public's confidence in law enforcement agencies, and, at oral argument on appeal, the City conceded that no public policy requires the discharge of an officer merely because he commits a Class A misdemeanor. Instead, the trial court held, and the City now appears to maintain, that it is Stumpf's specific conduct that demonstrates that public confidence in law enforcement requires that he be terminated, not merely suspended.

The trial court's reasoning and the City's argument are highly problematical for two reasons. First, they are inconsistent with the City's own account of why it terminated Stumpf. At the arbitration hearing, Chief Dahlberg made it plain that he decided to seek Stumpf's discharge only after, and only because, Stumpf was found guilty of a Class A misdemeanor. Dahlberg stated that Stumpf was *suspended* because his specific acts violated the rules of the police department and that a complete acquittal in the criminal case would not have affected the suspension. However, Dahlberg stated with equal clarity that a complete acquittal in the criminal case would have allowed Stumpf to "return to work full duty." Dahlberg explained that it was the simple fact of the adjudication of guilt, and not the details of Stumpf's conduct, that would unacceptably weaken public confidence in the police. Thus, throughout the proceedings at the administrative and arbitral levels, the City based its decision to terminate Stumpf on the fact of his guilt, not the specifics of his conduct.

The second problem with the trial court's reasoning and the City's present position stems from the first. Because the termination of Stumpf was not based on the specific facts of his conduct (many of which are highly disputed), the arbitrator and the trial court lacked a firm basis for deciding whether Stumpf's particular acts required his discharge. The arbitrator recognized that the firing of Stumpf was based on his guilt *per se* and not on the totality of the circumstances of April 15, 2001. Thus, the arbitrator told the parties that he would avoid "an evidentiary fight over what happened on April 15th." He immediately added—without objection from the City—that the City had claimed that the finding of guilt both triggered and justified its decision to terminate Stumpf.

In reviewing the arbitrator's decision, the trial court ignored the theory on which the case had proceeded and also resolved factual disputes that the arbitrator had deliberately avoided. For example, the court found that Stumpf banged on Tyran's window two to three times and screamed at Tyran, even though Stumpf denied such conduct and he was acquitted of all of the disorderly conduct charges against him. We are aware of nothing that allows a trial court reviewing an arbitrator's award to make its own findings of fact *de novo*. Although the City contends that the Union stipulated to its statement of facts in the trial court, the City's statement recited only what the various witnesses said; it did not purport to summarize what actually happened on April 15, 2001.

The trial court's reliance on the specifics of Stumpf's conduct, and the City's belated adoption of that perspective, clouds the issue in this appeal. May the City now argue *only* that public policy requires the

discharge of a police officer who is guilty of criminal trespass to a vehicle, regardless of the specific circumstances? Or may the City also argue that public policy requires the discharge of Stumpf under the specific facts of this case? We believe that fairness to the parties allows the City to maintain the latter, potentially more tenable position, but only insofar as it relies on undisputed facts that have a sound basis in the record. Thus, we shall ask whether public policy is inconsistent with the continued employment of Stumpf under the undisputed circumstances of this case. We shall disregard the trial court's improper resolution of disputed or unclear factual issues.

The trial court relied on a number of appellate court opinions that, in its view, have established the public policy in favor of maintaining the public's trust in law enforcement officials. See, *e.g.*, *Police Troopers Lodge No. 41*, 323 Ill. App. 3d at 329 (noting "the public policy favoring the exposure of crime"); *Kvidera v. Board of Fire & Police Commissioners*, 192 Ill. App. 3d 950, 965 (1989) (officer's improper conduct tended "to destroy public respect" and "raise[d] serious questions concerning her integrity and trustworthiness"); *Del Rivero v. Cahill*, 71 Ill. App. 3d 618, 623-24 (1979) ("A law enforcement officer is in a peculiar and unusual position of public trust and responsibility"); *Davenport*, 2 Ill. App. 3d at 869 (maintaining discipline in police department is necessary "for the proper functioning of the department" and in order to preserve "the respect of the public"). While we appreciate the trial court's concern for the desideratum of public trust and confidence in law enforcement officers, we cannot agree with the court that case law establishes an " 'explicit public policy' " (*AFSCME*, 124 Ill. 2d at 261, quoting *W.R. Grace*, 461 U.S. at 766, 76 L. Ed. 2d at 307, 103 S. Ct. at 2183) that clearly requires vacating the award in this case.

As the Union observes, the opinions on which the trial court relied do not hold, or even strongly imply, that a police department *must* discharge an officer who commits a Class A misdemeanor (or an offense of any kind) in circumstances comparable to those here. Most of the cases did not involve collective bargaining agreements and raised only the issue of whether, applying deferential review, a court may disturb a municipality's decision to discharge a misbehaving police officer. See, *e.g.*, *Duncan*, 338 Ill. App. 3d at 737 (municipality did not act arbitrarily in firing police officer who engaged in sexual relations in public and had previously possessed and used a false government identification card); *Kappel*, 220 Ill. App. 3d at 591 (municipality acted reasonably in discharging officer who possessed and sold unregistered firearms); *Kvidera*, 192 Ill. App. 3d at 964-65 (municipality did not act arbitrarily in discharging officer who verbally abused civilian and at-

tempted to impede investigation of that act and other alleged misconduct); *Sheehan v. Board of Fire & Police Commissioners*, 158 Ill. App. 3d 275, 289-90 (1987) (municipality did not act arbitrarily in discharging officer who committed theft and attempted theft and violated departmental rules); *Cahill*, 71 Ill. App. 3d at 623 (municipality may exclude person from police force if he has been convicted of driving under the influence of alcohol); *Davenport*, 2 Ill. App. 3d at 869-70 (municipality acted reasonably in discharging officer who, while off duty, attacked civilian without provocation).

Only in *Police Troopers Lodge No. 41* did the court discuss the application of the public-policy doctrine to an arbitrator's construction of a collective bargaining agreement. There, however, although the court identified a "public policy favoring the exposure of crime" (*Police Troopers Lodge No. 41*, 323 Ill. App. 3d at 329), it held only that a procedural rule limiting the investigation of officers' criminal acts violated public policy. The arbitrator's award was based on this procedural rule and not on a finding that there was no just cause to discharge the officers. *Police Troopers Lodge No. 41*, 323 Ill. App. 3d at 329.

The opinions that we have discussed, and the others on which the trial court relied, do hold that, absent a collective bargaining agreement to the contrary, it is within a municipality's prerogative to discharge an officer who has committed a serious criminal offense. That unremarkable proposition, however, is a far cry from a holding that a municipality must discharge (and not merely suspend) a police officer who commits a criminal offense under circumstances akin to the ones here. As no Illinois case appears to discuss this question squarely, we turn to foreign authorities that have applied the public-policy doctrine to circumstances resembling those here. These opinions support the Union's position that no public policy requires the discharge of Stumpf.

In *Town of South Windsor v. South Windsor Police Union Local 1480*, 255 Conn. 800, 770 A.2d 14 (2001), an arbitrator ordered the reinstatement of a police officer who had been discharged after he used excessive force against a group of teenagers who had illegally entered a gymnasium. The Connecticut Supreme Court upheld the arbitrator's decision. Applying legal standards identical to those used by Illinois courts, the court rejected the municipality's contention that the arbitrators' decision was contrary to "the public policy requiring the confidence of the public in its police force with respect to matters of public safety." *Town of South Windsor*, 255 Conn. at 824, 770 A.2d at 28. The court explained that "[t]his general consideration fails to meet the test that 'the public policy exception to arbitral authority

should be narrowly construed and \*\*\* limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *Town of South Windsor*, 255 Conn. at 824, 770 A.2d at 28, quoting *Groton v. United Steelworkers of America*, 254 Conn. 35, 46, 757 A.2d 501, 509 (2000).

In *Washington County Police Officers' Ass'n v. Washington County*, 335 Or. 198, 63 P.3d 1167 (2003), the Oregon Supreme Court held that an arbitrator's reinstatement of a discharged police officer did not violate public policy even though the officer was terminated because he illegally purchased and used small amounts of marijuana while he was off duty. The court explained that, although there was "a public policy prohibiting illegal drug use by employees (like grievant) holding safety-sensitive positions," (*Washington County*, 335 Or. at 203, 63 P.3d at 1169), there was no case law or statute that embodied "a clearly defined public policy that would preclude the employee's reinstatement" (*Washington County*, 335 Or. at 207, 63 P.3d at 1172).

In *City of Minneapolis v. Police Officers' Federation*, 566 N.W.2d 83 (Minn. App. 1997), an arbitrator reinstated a police officer who was discharged after a judgment was entered against him in a federal civil rights suit. In the federal suit, a jury found that the officer had used excessive force against a suspect who was in custody. In upholding the arbitrator's decision, the Minnesota Court of Appeals reasoned that, although there was "a well-defined and dominant public policy against police officers using excessive force," there was "no well-defined public policy stating that an officer must automatically be discharged if he or she is involved in an excessive force situation." *City of Minneapolis*, 566 N.W.2d at 89.

■ Aided by this limited but consistent authority, we must conclude that the City has failed to demonstrate that there is a well-defined and dominant public policy that requires the discharge of a police officer who is found guilty of misdemeanor trespass to a vehicle under the circumstances here. Again, the termination of Stumpf was based upon the finding of guilty, rather than the specific (largely disputed) facts of his conduct. Although the commission of the offense is obviously against public policy, the same cannot be said of the reinstatement of the offender. The City has not demonstrated that the laws and judicial precedents of Illinois require us to override the arbitrator's decision merely because of the fact of Stumpf's guilt of a Class A misdemeanor or because of the specific circumstances of this case. Therefore, we hold that the City has failed to satisfy the first prong of the public-policy test.

We hold next that the City has also failed to satisfy the second prong of the test, as it has not persuaded us that the arbitrator's finding that Stumpf was reasonably unlikely to reoffend was not rational. As noted, even where a public policy has been identified, a court must defer to the arbitrator's decision to reinstate a discharged employee "as long as the arbitrator makes a rational finding that the employee can be trusted to refrain from the offending conduct." *DuBose*, 173 Ill. 2d at 322. In arguing that the arbitrator's finding in this case was not rational, the City emphasizes that, despite the jury's finding that he violated the law, Stumpf has remained unrepentant and has persisted in his belief that he did not violate the law. The City reasons, as did the trial court, that nothing is gained by allowing the City to order Stumpf to undergo anger management training, as his acts resulted not from anger but from a stubborn belief that he was right. The City's argument is not without force. However, the issue is not whether we agree with the arbitrator's optimistic assessment of Stumpf's future but only whether that assessment was rational. We conclude that it was.

The parties agree that, before he was suspended in October 2001, Stumpf had served in the police department for 13 years without any disciplinary problems. That fact, if not dispositive in itself, gave the arbitrator reason to conclude that Stumpf's misconduct was an aberration that would not be repeated. We note that the circumstances of this case were quite out of the ordinary, involving an incident in which a close family member was a party. Moreover, Stumpf surely did not escape punishment. He was suspended without pay for 18 days, a clear warning for the future.

Ironically, the arbitrator's finding that Stumpf is reasonably likely not to reoffend draws considerable support from the City's actions and the words of its police chief. The City suspended Stumpf for 18 days because Chief Dahlberg and the City concluded that Stumpf had violated numerous rules and regulations of the police department and the City. The City did not need to await the result of the criminal trial before finding that Stumpf had misbehaved seriously. Yet Dahlberg and the City were content to deal with Stumpf's misconduct by suspending him for 18 days. At the time, therefore, Dahlberg and the City apparently concluded that Stumpf was not at a high risk of reoffending—certainly not such a high risk that firing him was necessary.

Indeed, Dahlberg conceded that, had Stumpf been acquitted of all of the charges, he would have been able to return to work full-time, despite his improper and unbecoming conduct. Only after the jury found Stumpf guilty of a crime did the City conclude that terminating Stumpf was necessary. This conclusion had nothing to do with the risk

that Stumpf would reoffend. Dahlberg recommended that Stumpf be fired because the simple fact of Stumpf's guilt created an unacceptable danger to police department morale and public confidence in the police. The City's conduct and its explanation for that conduct are quite consistent with the arbitrator's finding that Stumpf was reasonably likely not to repeat his improprieties. We cannot say that this finding was irrational. Therefore, even assuming the existence of the public policy for which the City has argued, we have no ground to disturb the arbitrator's reinstatement of Stumpf.

Finally, we note the City complains that the arbitrator in this case, Edwin H. Beane, has made at least three awards reinstating public employees that were later vacated by Illinois courts. See *Chicago Fire Fighters Local No. 2 v. City of Chicago*, 323 Ill. App. 3d 168 (2001); *DuBose*, 173 Ill. 2d 299; *Department of Central Management Services v. American Federation of State, County & Municipal Employees*, 245 Ill. App. 3d 87 (1993). The City fails to explain how the arbitrator's previous decisions are relevant to this case. We note that the CBA provides a process allowing both the Union and the City input in the selection and rejection of neutral arbitrators. If the City is so against this particular arbitrator, the process allowed the City to reject him.

The judgment of the circuit court of Lake County is reversed, and the arbitrator's award is reinstated.

Reversed.

O'MALLEY, P.J., and BYRNE, J., concur.