No. 2-25-0080
Opinion filed January 14, 2026

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE VILLAGE OF HAMPSHIRE | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 24-MR-364 |
| | ) | |
| ILLINOIS FRATERNAL ORDER | ) | |
| OF POLICE LABOR COUNCIL, | ) | Honorable |
| | ) | Kevin T. Busch, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court, with opinion.
Justices Hutchinson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1                                          I. INTRODUCTION

¶ 2     Sandro Palomares served as a police officer for plaintiff, the Village of Hampshire, from December 2021 until February 2023, when his employment was terminated. Defendant, the Illinois Fraternal Order of Police Labor Council, represented Palomares throughout the grievance process and the arbitration that followed. In an opinion and award dated August 1, 2024, the arbitrator found that plaintiff lacked just cause to terminate the employment of Palomares and ordered plaintiff to reinstate Palomares as a police officer. Plaintiff filed a motion in the circuit court of

Kane County to vacate the award. The trial court denied the motion and confirmed the award, and plaintiff appealed. We affirm the trial court and confirm the arbitrator's award.

¶ 3                                    II. BACKGROUND

¶ 4    When Palomares's employment was terminated in February 2023, plaintiff and defendant were parties to a collective bargaining agreement (CBA) that was valid from May 1, 2020, to April 30, 2023. The CBA provided that the suspension or dismissal of nonprobationary police officers could be challenged through a grievance and arbitration proceeding specified in the CBA. On February 28, 2023, Palomares filed a timely grievance under the CBA. When the dispute was not resolved during the grievance process, arbitration proceedings followed. An arbitration hearing was held on May 14, 2024. Testimony was given by Janet Mahoney of the Kane County State's Attorney's Office (Kane County SAO); Douglas Pann, plaintiff's chief of police; and James Kruger, who had previously served as chief of police in East Dundee, Oak Brook, Roselle, and Winfield. The parties also agreed to the admission of the stipulated testimony of Hobert Jones, a police lieutenant employed by plaintiff.

¶ 5    The following evidence was adduced during the arbitration proceedings, including the May 14, 2024, hearing. In the fall of 2021, Palomares applied to become a police officer in plaintiff's police department. His employment application listed these previous positions: March 2016 to present, dispatcher for the Wheeling Police Department; May 2016 to April 2021, part-time police officer for Prairie Grove, Holiday Hills, and the marine unit of the Wauconda Police Department; and January 2007 to March 2016, police officer for the Wheeling Police Department.

¶ 6    Palomares stated on his application that he left his position as a police officer in Wheeling because of "[r]eassignment of duties due to conflict w/past supervisor." In response to the question, "Have you ever received formal discipline during any prior employment or job positions such as

an oral reprimand, written reprimand, or suspension?" Palomares checked "Yes" and wrote, "Copies of the documents regarding the suspensions have been tendered to Chief Thompson," *i.e.*, Brian Thompson, plaintiff's then-chief of police. In response to the question, "Have you been discharged or forced to resign from any employment (not including layoff)?" Palomares checked "Yes" and wrote, "Copies of the documents regarding the resignation have been tendered to Chief Thompson."

¶ 7     As part of his application, Palomares provided plaintiff with three documents relevant to this case: an order of suspension dated April 6, 2014, from Wheeling Chief of Police William Benson; a temporary administrative leave directive dated January 22, 2016, from Wheeling Chief of Police James Dunne; and a voluntary separation agreement dated March 3, 2016, between Palomares and Wheeling. The 2014 order of suspension stated in part: "This suspension is based on your actions on February 19, 2014 when you altered the disposition of a traffic stop initiated on January 31, 2014." Page two of the order of suspension purported to quote as follows from "Standard Operating Procedures A-24, Section I. A., 3 & 4":

> "3. Written warning notice with Traffic Stop Data sticker (see Appendix A). Stickers will be placed on the back of the manila copy of the ticket. 4. A Traffic Stop Data Sheet shall be completed on traffic stops where a verbal warning is given and no citation issued (see Appendix B)."

¶ 8     Also listed on page two, under "Wheeling Police Department—Rules and Regulations," were citations to "210.10 Integrity" and "210.26 Truthfulness."

¶ 9     The administrative leave directive from Chief Dunne stated in part:

> "I have been notified by a representative of the Cook County State's Attorney that they do not intend to prosecute any misdemeanor or felony cases where you were the arresting

officer, or in which you are the material witness. Based upon that notice, I am hereby placing you on a temporary administrative leave of absence, with pay, pending further inquiry."

In the voluntary separation agreement, Palomares agreed to resign from his position as a Wheeling police officer and to "not seek or accept future employment as a police officer with [Wheeling] at any time." The agreement also stated that Wheeling would offer him "a non-sworn position of Radio Operator."

¶ 10    In October and November 2021, Jones conducted a preemployment background investigation of Palomares. As part of that process, Jones sent a memo dated October 14, 2021, to Thompson. The memo stated in part:

"I spoke to Chief James Dunne of the Wheeling Police Department in regards to a memo that was given to [Palomares] dated January 22, 2016. Chief Dunne explained that the previous administration had some complaints filed against it by a few [o]fficers in the department ([Palomares] being one of them). When the investigation was completed the person who they were going to promote to Chief retired from the department. Chief Dunne was given notice by Cook County ASA Office about an issue with [Palomares] not being truthful in an internal investigation about a traffic ticket. Chief Dunne talked with Union officials and [Palomares,] and it was decided not to pursue the matter ***. Chief Dunne tried to look further into the Cook County ASA Office on whether this was a lie during [an] internal [investigation] or something misspoken that would not rise to the level of a '*Brady* Officer' and had a negative result.

He could not get an answer. I asked if he had anything that would list him as a '*Brady*' Officer at the [p]olice department and he stated there was nothing in the police

department that would put him in the '*Brady*' category. Chief Dunne stated [Palomares] is an excellent officer.

Based on what I found out I would recommend [Palomares] to continue through the process."

Following the completion of the preemployment investigation, plaintiff hired Palomares as a police officer.

¶ 11    In early January 2022, just weeks after hiring Palomares, plaintiff received an anonymous letter accusing Palomares of inappropriate and criminal actions while he served as a Wheeling police officer. The writer claimed to know Palomares through a mutual friend. The writer also claimed to have learned from a Wheeling police officer that Palomares had "officially lied" and that "there was a law that he could not testify in court so therefore he could not be a police officer." The letter also referenced "*Brady-Giglio*." Under that pair of United States Supreme Court cases— *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972)— prosecutors must notify criminal defendants of any evidence that may be used to impeach the credibility of prosecution witnesses, including police officers.

¶ 12    After plaintiff received the anonymous letter, Jones investigated the allegations contained in the letter. In January 2022, plaintiff's police department asked Palomares to provide a written response. In his response, Palomares stated, "In reference to the incident involving the altering of a traffic stop from a verbal warning to a written warning, I did not lie and presented investigatory records to the Hampshire Police [D]epartment regarding the incident." As part of his investigation, Jones reviewed Palomares's personnel file from the Wheeling Police Department. Jones ultimately issued a memo recommending that plaintiff continue employing Palomares as a police officer.

¶ 13     In September 2022, Thompson was replaced on an interim basis by Pann, who became plaintiff's permanent police chief in February 2023. In the fall of 2022, Pann began reviewing the personnel files for each officer in his department. Pann testified at the arbitration hearing that, in December 2022, he reviewed Palomares's file, including Jones's memos regarding his investigations into Palomares's application materials and the anonymous letter. Pann had "concerns" and "questions" after reading those materials. Referencing Jones's memos specifically, Pann said, "Neither process was done to what I would expect or what I do in background investigations or internal investigations today." However, Pann decided not to take any action at that time; he believed he needed to "trust that the previous administration vetted these things out and appropriate decisions were made." When asked about Palomares's performance as an employee, Pann testified:

> "As far as my observations and what I was informed from the previous administration as far as his performance as a police officer was it was exemplary. I had no disciplinary issues with [Palomares]. I had no complaints about him. I thought he did a very good job, and I gave him additional responsibilities. ***.
>
> And as far as I could tell, he was a good employee and he was doing a good job and he was collecting evidence for us on very significant cases, the most significant cases that we had. I also was planning on moving him into evidence room custodian. And all of these things were in the works. So he was a good employee for me."

¶ 14     On December 21, 2022, Pann created a post on plaintiff's Facebook page, sharing that the Kane County SAO had presented a training program to the police department on Public Act 101-652 (eff. Jan. 1, 2023), referring to it as the SAFE-T Act. An anonymous Facebook account made this comment on Pann's post:

"I support the [p]olice. But every profession has problems and rogue officer(s). The SAFE-T Act may assist in holding rogue officers accountable. Unfortunately, HPD hired one of those officers in 2021. The officer is ineligible to testify in court and is on the *Brady* list. Hope this does not come back to bite the tax paying good citizens of Hampshire once the defense attorneys discover this and arrests/convictions can be appealed/lawsuits will be filed. REGULAR MEETING OF THE BOARD OF TRUSTEES MINUTES December 2, 2021."

¶ 15    After seeing the anonymous comment, Pann reviewed the meeting minutes from December 2, 2021, and discovered that day was when Palomares was sworn in as a police officer for plaintiff. Pann reviewed Palomares's personnel file again and met with Palomares. Pann informed Palomares that he would be investigating the information in the Facebook comment as well as the anonymous letter that the department had received nearly a year earlier. Pann testified that Palomares was upset about the Facebook comment and believed it was written by the same person who sent the anonymous letter. Palomares asked if there was any way to stop the anonymous accusations. Pann said he would discuss Palomares's file and the Facebook comment with the Kane County SAO.

¶ 16    Pann next contacted Chief Dunne of the Wheeling Police Department to try to obtain information about Palomares's suspension and resignation. Dunne said the records had been destroyed in accordance with Illinois law in place at that time. Dunne also indicated that he was never able to obtain any information from the Cook County State's Attorney's Office (Cook County SAO) regarding Palomares's placement on a *Brady* disclosure list. Pann then contacted the Cook County SAO but never heard back. Pann testified that, for three primary reasons, he next contacted the Kane County SAO:

"One, because I felt they could help me with the [Cook County SAO], so like state's attorney to state's attorney perhaps they could get information if there was any information they could help me to get that.

And second was *** I felt like they needed to weigh in on the significance of the information in the employee file in Kane County.

I also *** wanted to talk to them about this anonymous poster and *** whether there was any criminal laws being violated. I didn't believe there was, but I wanted to see if there was a possibility of something there.

So for those reasons, I contacted the [Kane County SAO] and was directed to [Mahoney] to review the information."

¶ 17 Pann met with Mahoney on January 10, 2023. She told him that, in January 2022, the Kane County SAO had received the same anonymous letter that the police department had received. She said she asked Thompson to investigate the letter and advise her of his findings, but she never heard back from him. Pann and Mahoney then reviewed Palomares's personnel file, which included the documents related to the suspension, administrative leave, and voluntary separation. After reviewing the documents, Mahoney told Pann that she was concerned about using Palomares as a witness in any criminal prosecution.

¶ 18 Pann testified as follows:

"Q. After [Mahoney] informed you that she sought a response from [the] previous administration, what was the rest of your discussion?

A. *** At the end of the conversation, she sat back in her chair and said, 'I will never call him as a witness in Kane County.' I said, 'well, that's significant because I can't have an officer not deployable that can't testify in court.'

> Q. Are you summarizing what she said or were those her exact words, that she will not call him as a witness in Kane [C]ounty?
>
> A. *** I'm summarizing, but when I left the office that day, my understanding is they will not call him. Now, she had not reviewed with her peers and she had not issued anything official at that point."

Pann asked Mahoney to confer with her colleagues at the Kane County SAO to see if they shared her concerns about Palomares.

¶ 19    Mahoney testified that, after the reviewing the documentation pertaining to Palomares, she was concerned about using him as a witness because, under *Brady* and its progeny, anytime Palomares was a witness in a case, the Kane County SAO would need to disclose the fact that Palomares was suspended from the Wheeling Police Department for altering the disposition of a traffic stop in 2014. Mahoney stated that she would need to place Palomares on a "disclosure list" (or "*Brady* list") based on his conduct while he was employed as a police officer in Wheeling. Mahoney further testified that this disclosure would put Palomares's credibility at issue, which could make prosecution of a case difficult if Palomares were the material witness. Mahoney also testified that, after she met with Pann, she consulted with the first assistant state's attorney and the head of the criminal division of the Kane County SAO. The three concluded that the Kane County SAO would try not to call Palomares as a witness in any case. Pann subsequently spoke to Mahoney on the phone. Immediately following that conversation, Pann placed Palomares on paid administrative leave.

¶ 20    The notice provided to Palomares stated, in part:

> "[Palomares,] effective immediately, I am placing you on paid temporary administrative leave pending investigation of the matter described below:

In the morning hours of January 12, 2023, I received verbal notice from [Mahoney] that the [Kane County SAO] does not intend to utilize you as a material witness in any misdemeanor or felony court proceedings based on incidents that occurred prior to your appointment as a Hampshire Police Officer."

¶ 21 As part of his investigation into the matter, Pann sent a Freedom of Information Act (5 ILCS 140/1 *et seq.* (West 2022)) request to the Cook County SAO, asking for "all records related to Wheeling Police Officer [Palomares], both in his capacity as a police officer and a dispatcher, that reflect his ability to testify[,] from 2013 until 2021." Pann also emailed Christine Bayer, first assistant state's attorney for Kane County, to request that she confirm in writing that the Kane County SAO would no longer call Palomares to testify in Kane County.

¶ 22 In response, Bayer sent Pann a letter dated February 15, 2023, which stated:

"Based on documents received by the [Kane County SAO] in relation to *Brady/Giglio* disclosures, we have determined that we would no longer want to call [Palomares] to testify in any [m]isdemeanor or [f]elony case in Kane County. We believe if he were called to testify, it would have a major impact on the success of the prosecution of our cases and would cast doubt on the integrity of the investigation and procedures for the case. We would employ every strategy in the prosecution of the case in order to avoid [Palomares's] testimony. We would request that for any investigation to which he may be assigned that he would have another officer with him at all times so that we could call that officer instead of [Palomares]."

¶ 23 On February 21, 2023, Pann provided a copy of Bayer's letter and a notice of potential discipline to Palomares and defendant's representative. The notice explained that, because the Kane County SAO had decided that it "will no longer call [Palomares] to testify in any

[m]isdemeanor or [f]elony case," Palomares could no longer serve effectively as a police officer for plaintiff. The letter further explained that, due to its size and staffing level,

"the [d]epartment cannot have another officer with [Palomares] at all times in the field, and there is no assignment in our [d]epartment that do [*sic*] not require officers to go in the field. Continuing to deploy you to active patrol assignment would bring undo [*sic*] exposure to risk for you, the [d]epartment, the Village and the citizens of Hampshire."

In response to the notice, Palomares told Pann that he did not intend to resign. On February 24, 2023, Pann terminated Palomares's employment.

¶ 24    Kruger testified that, based on his experience as a police chief with various departments, "deploying a patrol officer who is unable to credibly testify in prosecutions [would] cause potential liability to [plaintiff]."

¶ 25    In the arbitrator's opinion and award dated August 1, 2024, he addressed the issue of whether plaintiff had just cause under the CBA to discharge Palomares. In coming to his conclusion that plaintiff did not have just cause, the arbitrator noted that, in its February 15, 2023, letter, the Kane County SAO did not say it "barred [Palomares] from testifying" but, rather, that it "would no longer want to call" Palomares as a witness. Because Palomares could still testify in court, "albeit with greater scrutiny from the defense," he could still fulfill the requirements of his position as a police officer. Throughout his opinion, the arbitrator also highlighted (1) that plaintiff had the documents related to Palomares's suspension when plaintiff considered his application and conducted his preemployment background investigation; (2) that, according to plaintiff, Palomares's termination had nothing to do with his performance while plaintiff employed him; and (3) that plaintiff's police leadership viewed Palomares as an exemplary police officer. Having

determined that plaintiff lacked just cause under the CBA to terminate plaintiff, the arbitrator sustained the grievance and ordered that Palomares be reinstated and made whole.

¶ 26    Plaintiff appealed the arbitration award by filing a motion in the trial court to vacate the arbitration award. The court heard oral arguments before denying the motion and confirming the award. This appeal followed.

¶ 27                                    III. ANALYSIS

¶ 28    In this case, the only issue before the arbitrator was whether plaintiff had just cause under the CBA to terminate the employment of Palomares. The arbitrator found that plaintiff did not have just cause. On appeal, plaintiff does not dispute the arbitrator's finding as it concerns the CBA and its criteria for termination; instead, plaintiff asserts that the arbitration award violates Illinois public policy against reinstating police officers found to be untruthful.[1] In response, defendant argues that no issues of untruthfulness came before the arbitrator, that Palomares's

---

[1]Plaintiff offers several iterations of the public policy allegedly violated by the arbitration award, some of which seem to imply that Illinois public policy prohibits reinstatement of police officers whom a state's attorney's office has placed on a disclosure list or "*Brady*" list. However, plaintiff offers the following clarification in its reply brief:

"[Defendant] *** misleadingly argues that: '[t]here is no established public policy that an officer's placement on a *Brady-Giglio* disclosure list mandates termination.' ***.

        However, that is not the holding in [*City of Country Club Hills v. Charles*, 2020 IL App (1st) 200546], and [plaintiff] never made such an argument. What the *Country Club Hills* court actually determined was that '[t]here is a robust and uniform body of case law establishing a public policy in Illinois that police officers be absolutely honest.' *Charles*, 2020 IL App (1st) 200546, ¶ 23."

employment was terminated solely because the Kane County SAO added him to a disclosure list, and that plaintiff has failed to establish that reinstating Palomares would violate a public policy. Therefore, defendant asks us to affirm the arbitrator's award.

¶ 29 Our supreme court "has consistently recognized that the judicial review of an arbitral award is extremely limited." *American Federation of State, County & Municipal Employees, AFL-CIO v. Department of Central Management Services*, 173 Ill. 2d 299, 304 (1996) (*AFSCME*). Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, the parties must accept the arbitrator's view of the facts as well as the arbitrator's interpretation of the contract. *Griggsville-Perry Community Unit School District No. 4 v. Illinois Educational Labor Relations Board*, 2013 IL 113721, ¶ 18. As such, it is not the role of a reviewing court to reweigh the evidence presented to the arbitrator or the credibility of the witnesses. See *City of Country Club Hills v. Charles*, 2020 IL App (1st) 200546, ¶¶ 27-28.

¶ 30 However, "[a]s with any contract, a court will not enforce a collective bargaining agreement that is repugnant to established norms of public policy." *Illinois State Toll Highway Authority v. International Brotherhood of Teamsters, Local 700*, 2015 IL App (2d) 141060, ¶ 44. This public-policy exception, however, is very narrow and can "be invoked only when a party clearly shows enforcement of the contract, as interpreted by the arbitrator, contravenes some explicit public policy." *City of Chicago v. Fraternal Order of Police, Chicago Lodge No. 7*, 2020 IL 124831, ¶ 25. Applying the public-policy exception to an "arbitration award [that] is derived from the essence of the collective-bargaining agreement" requires a two-step analysis. *Id.* Under the first prong of the analysis, we determine "whether a well-defined and dominant public policy can be identified through a review of our constitution, statutes, and relevant judicial opinions." *Id.* ¶ 26. Under the second prong of the analysis, we determine "whether the arbitrator's award, as

reflected in his interpretation of the agreement, violated the public policy." *Id.* "This inquiry 'is necessarily fact dependent' [citation]; however, the question of whether an award violates public policy is one of law, which we review *de novo*." *City of Des Plaines v. Metropolitan Alliance of Police, Chapter No. 240*, 2015 IL App (1st) 140957, ¶ 20 (quoting *AFSCME*, 173 Ill. 2d at 311).

¶ 31 When, as here, a party asserts that reinstatement of an employee would violate public policy, there must be either "an explicit legal prohibition against the reinstatement" or "some well-defined and dominant policy, not merely a value judgment or notion of the public interest, that implicitly forbids the employee's reinstatement." *City of Highland Park v. Teamster Local Union No. 714*, 357 Ill. App. 3d 453, 462 (2005). Where there is neither an explicit nor implicit prohibition against the reinstatement, "the reinstatement of an employee who has violated an important public policy does not necessarily itself violate public policy." *Id.*

¶ 32 We begin our analysis by considering plaintiff's argument, which relies on case law to assert that Illinois has a public policy against reinstating police officers found to be untruthful. We next look to Illinois statutes for evidence of the public policy proposed by plaintiff. If we determine that such a policy exists, we decide whether plaintiff has clearly shown that enforcement of the CBA, as interpreted by the arbitrator, contravenes that policy.

¶ 33 Plaintiff primarily relies on *Charles* to assert that Illinois has a public policy against reinstating police officers found to be untruthful. In *Charles*, the police chief for the City of Country Club Hills terminated the employment of a police officer based, in part, on the allegation that the officer had filed an incomplete and untruthful report during an investigation into the escape of a detainee from a booking room after the officer arrested him. *Charles*, 2020 IL App (1st) 200546, ¶¶ 3-4, 10, 12. With respect to that accusation of untruthfulness, the arbitrator found that, although "some of [the officer's] statements 'could be viewed as somewhat self-serving and self-

exonerating,' *** there was insufficient evidence to find they were made with the intent to deceive 'through omission of material fact.' " *Id.* ¶ 13. The arbitrator also found that the officer's report regarding another incident concerning a patrol issue "lacked candor." *Id.* ¶ 14. However, the arbitration award ordered Country Club Hills to reinstate the officer and allowed for no discipline beyond a written warning for procedural failures that contributed to the detainee's escape. *Id.*

¶ 34 Country Club Hills then filed a complaint in the trial court, asking the court to vacate the arbitration award on the basis that it violated public policy by not upholding the termination. *Id.* ¶ 15. The trial court confirmed the award, and Country Club Hills appealed. *Id.* ¶ 16. On appeal, Country Club Hills argued that, "under the facts presented, any award imposing a penalty of less than discharge violates public policy." *Id.* ¶ 18. In contrast, the officer argued that "public policy does not specifically require that [he] be discharged for his conduct." *Id.* In its analysis, the First District (citing several of its own opinions and one from the Second District) found that "[t]here is a robust and uniform body of case law establishing a public policy in Illinois that police officers be absolutely honest" and therefore held that "there is a recognized public policy in Illinois that a police officer must be honest and not provide false, misleading, or incomplete statements in connection with his duties." *Id.* ¶¶ 23, 25. Having found the first prong of the test satisfied, the court moved on to the second prong. *Id.* ¶¶ 25-26.

¶ 35 In considering whether the arbitrator's award violated the public policy identified, the *Charles* court acknowledged that, because the arbitrator was the finder of fact, the court's "role [was] not to reweigh the evidence presented to the arbitrator." *Id.* ¶ 27. With that limitation in mind, the court examined the record as well as the award and found that, despite the arbitrator's contrary determination, the officer had acted dishonestly in omitting key details about the prisoner's escape and in lying about his patrol activities. *Id.* ¶¶ 29-30. After finding the second

prong of the test satisfied, the *Charles* court ultimately concluded that the arbitral decision to impose only a written warning violated public policy. *Id.* ¶ 33. Based upon "the cumulative mosaic of facts regarding the two incidents," the court held that termination was "the only remedy consistent with public policy for [the officer's] misconduct." *Id.* ¶ 36. But to be clear, *Charles* avoided stating that, under Illinois public policy, termination is the only discipline for *all* officer dishonesty. In fact, the court said,

> "we do not find, from our review of the case law, an absolute rule that any instance of police dishonesty must result in termination from service. Obviously, each case presents [a] unique set of facts, for which one must take into account the officer's prior record, the benefits of progressive discipline, the culpability of the officer, and the potential peril to the municipality created by the particular dishonesty at issue." *Id.* ¶ 35.

¶ 36    In her dissent, Justice Cunningham argued that the majority erred by relying "solely on the cold record" to overturn the decision of the arbitrator, who had "ample opportunity to observe the witnesses and determine their credibility and the visual nuances that give the trier of fact an impression of the witnesses and their testimony." *Id.* ¶ 46 (Cunningham, J., dissenting). Justice Cunningham disagreed with the majority's ruling, stating, "I can find no support for the position that termination is the *only acceptable sanction* for the lack of candor which the arbitrator found [the officer] to have committed." (Emphasis in original.) *Id.* ¶ 54. Justice Cunningham did not take issue with the existence of the public policy established under the first prong of the analysis. She instead looked to the second prong of the analysis and asserted that "the arbitrator's decision did not run afoul of public policy" because "there was no clear-cut evidence that the totality of facts and circumstances were so egregious that termination was the only and obvious conclusion at the end of the arbitration process." *Id.* ¶¶ 42, 54.

¶ 37    Thus, whether we consider the majority opinion or the dissenting opinion, *Charles* does not support the proposition that Illinois public policy places a blanket prohibition on the employment of any police officer found to be dishonest. Instead, *Charles* underscores the fact that our analysis under the second prong is "necessarily fact dependent." (Internal quotation marks omitted.) See *Des Plaines*, 2015 IL App (1st) 140957, ¶ 20.

¶ 38    We turn next to the Illinois Police Training Act (Act) (50 ILCS 705/1 *et seq.* (West 2022)). The Act provides for the creation of the Illinois Law Enforcement Training Standards Board (Board). *Id.* § 1. We look to the Act for the sole purpose of ascertaining Illinois public policy regarding the employment and termination of police officers. Under the Act, no one can serve as a police officer in Illinois without being certified by the Board. *Id.* § 8.1(a). The Act also provides for the decertification of officers. For instance, the Act provides for the "[a]utomatic decertification of full-time and part-time law enforcement officers" found guilty of (1) a felony or (2) on or after January 1, 2022, any misdemeanor specified in that section. *Id.* § 6.1(a), (e). We conclude from the Act that Illinois has an explicit legal prohibition against the employment of police officers with certain criminal backgrounds. See *id.* § 6.1(a).

¶ 39    In contrast, the Act provides for the "[d]iscretionary decertification of full-time and part-time law enforcement officers" (*id.* § 6.3) who have, *inter alia*, made a "false statement" "relating to the reporting, investigation, or prosecution of a crime" or engaged in "deceptive *** conduct *** harmful to the public." *Id.* § 6.3(b)(5), (6). We hasten to note that the Act narrowly defines a " '[f]alse statement' " as "(1) any knowingly false statement provided on a form or report, (2) that the writer does not believe to be true, and (3) that the writer includes to mislead a public servant in performing the public servant's official functions." *Id.* § 6.3(a). We also note that the Board may decline to investigate further when it finds there is insufficient information to support an

allegation. *Id.* § 6.3(e)(4). Because the Act provides for only *discretionary* decertification (see *id.* § 6.3(h)(9)), even when it has been determined that a police officer made a false statement intended to mislead or engaged in deceptive conduct harmful to the public (see also *id.* § 6.3(a), (b)(5), (6)), we conclude that Illinois does not have an explicit legal prohibition against the employment of such officers.

¶ 40 Based upon our review of both the Act and case law, we disagree with plaintiff that Illinois has a well-defined and dominant public policy against reinstatement of police officers found to be untruthful. Plaintiff's articulation of the alleged policy conflates the two-pronged test into a single inquiry. See *Des Plaines*, 2015 IL App (1st) 140957, ¶ 23 ("The issue is not whether the public policy itself requires that the employee be terminated. Rather, we *** determine whether the arbitrator's award reinstating the employee, *under the circumstances of the particular case*, violates that identified public policy." (Emphasis added.)). However, we do agree with the conclusion of the *Charles* court: "there is a recognized public policy in Illinois that a police officer must be honest and not provide false, misleading, or incomplete statements in connection with his duties." *Charles*, 2020 IL App (1st) 200546, ¶ 25. Thus, the first prong of the public-policy exception has been satisfied.

¶ 41 The second step of our analysis requires us to examine whether the arbitrator's award violated the public policy. *City of Aurora v. Association of Professional Police Officers*, 2019 IL App (2d) 180375, ¶ 54. This is the fact dependent inquiry necessary for "ultimate applicability" of the exception. *AFSCME*, 173 Ill. 2d at 311 (holding that arbitral award reinstating—without any discipline—Department of Children and Family Services case worker who fabricated report concerning children in foster care violated public policy, where reinstatement was based on clause in CBA that required any discipline to be commenced within 45 days of alleged wrongdoing and

where the fabrication was not discovered until seven months later). To accomplish this, we review the evidence presented to the arbitrator. *Charles*, 2020 IL App (1st) 200546, ¶ 26. As *Charles* put it, "each case presents [a] unique set of facts, for which one must take into account the officer's prior record, the benefits of progressive discipline, the culpability of the officer, and the potential peril to the municipality created by the particular dishonesty at issue." *Id.* ¶ 35.

¶ 42    Based on the record before us, we hold that plaintiff has failed to demonstrate that the arbitrator's ruling violated public policy. Not much is known of the incident in 2014. Any additional Wheeling Police Department records associated with Palomares's suspension and resignation were destroyed in accordance with Illinois law at that time. We know that Chief Benson's order of suspension stated that Officer Palomares "altered the disposition of a traffic stop" and referred to department procedures concerning warning tickets and department rules about truthfulness and integrity. In January 2022, Palomares described his conduct at the request of his superiors in Hampshire, writing, "In reference to the incident involving the altering of a traffic stop from a verbal warning to a written warning, I did not lie and presented investigatory records to the Hampshire Police [D]epartment regarding the incident." The record also shows Officer Palomares was disciplined by Wheeling with a suspension of four days, of which two days were held in abeyance. According to the arbitrator, he was forthcoming about his disciplinary history at Wheeling during his onboarding at the Hampshire Police Department in the fall of 2021, and his performance thereafter was, according to witness testimony, "exemplary."

¶ 43    And when the arbitrator quoted Hampshire police lieutenant Jones's memo dated October 14, 2021, he highlighted the fact that it was unclear what Palomares was supposed to have lied about:

"Chief Dunne [(the current Wheeling Police Chief and successor to Chief Benson of Wheeling, who originally imposed the discipline)] tried to look further into the Cook County ASA Office on whether this was a lie during [an] internal [investigation] or something misspoken that would not rise to the level of a '*Brady* Officer' ***.

He could not get an answer. I asked if he had anything that would list him as a '*Brady*' Officer at the [p]olice department and he stated there was nothing in the police department that would put him in the '*Brady*' category. Chief Dunne stated [Palomares] is an excellent officer."

¶ 44    The public-policy exception is very narrow and can "be invoked only when a party clearly shows enforcement of the contract, as interpreted by the arbitrator, contravenes some explicit public policy." *City of Chicago*, 2020 IL 124831, ¶ 25. Where there is neither an explicit nor implicit prohibition against the reinstatement, "the reinstatement of an employee who has violated an important public policy does not necessarily itself violate public policy." *City of Highland Park*, 357 Ill. App. 3d at 462. If we accept that Palomares's conduct violated the important public policy requiring police officers to be honest and truthful, we must still examine these "unique set of facts *** [and] take into account the officer's prior record, the benefits of progressive discipline, the culpability of the officer, and the potential peril to the municipality created by the particular dishonesty at issue." *Charles*, 2020 IL App (1st) 200546, ¶ 35.

¶ 45    Palomares's culpability for untruthfulness is based only on the 2014 incident where he apparently changed a verbal warning to a written warning. The facts and circumstances surrounding this action are not clear, but we do know that contemporaneous discipline was meted out, and in the decade-plus since the incident, the officer's record of service to the municipalities for which he worked has been praised as "excellent," "a very good job," and "exemplary."

Therefore, we find that plaintiff has failed to clearly show that the enforcement of the contract, as interpreted by the arbitrator, contravened explicit public policy. See *City of Chicago*, 2020 IL 124831, ¶ 25.

¶ 46                              IV. CONCLUSION

¶ 47    For the reasons stated, we affirm the judgment of the circuit court of Kane County and confirm the arbitrator's award.

¶ 48    Affirmed.

*Village of Hampshire v. Illinois Fraternal Order of Police Labor Council*,
**2026 IL App (2d) 250080**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 24-MR-364; the Hon. Kevin T. Busch, Judge, presiding. |
| **Attorneys for Appellant:** | Paul Denham, of Clark Baird Smith LLP, of Rosemont, for appellant. |
| **Attorneys for Appellee:** | Tamara L. Cummings, of Illinois Fraternal Order of Police Labor Council, of Carol Stream, for appellee. |